## THE ALLEGHENY. THE EMILY MARIE. THE LIGHTER NO. 17.

(Circuit Court of Appeals, Third Circuit. May 25, 1918.)

Nos. 2378, 2379.

1. TOWAGE ⬤⟳15(2)—INJURY TO TOW—PRESUMPTION OF FAULT.
    When, in passing through the span of a bridge 500 feet wide, under favorable weather conditions, two of eight barges making up a tow were seriously damaged by striking one of the piers, the burden rests on the tug to exonerate herself from presumed fault.

2. TOWAGE ⬤⟳11(1)—DUTY OF TUG TO KEEP TOW IN PROPER CONDITION.
    It is not sufficient for the master of a towing tug to see that his tow is properly made up; but it is his duty to keep it under constant observation, and to see that it remains in proper condition.

3. TOWAGE ⬤⟳11(7)—INJURY TO TOW—LIABILITY OF TUG.
    A tug *held* not exonerated from fault for permitting its tow to swing against a bridge pier by the fact that the tow was disarranged by another tug, which without its knowledge removed one of the boats while moving, where this occurred an hour before the collision and could have been readily discovered.

4. TOWAGE ⬤⟳11(1)—DUTY OF TUG—KNOWLEDGE OF CURRENTS.
    It is the duty of the master of a tug, towing on a tidal river, to know the set of the tides and currents.

Appeal from the District Court of the United States for the District of New Jersey; Thos. G. Haight, Judge.

Suits in admiralty by Harry W. Whiteman, owner of the lighter Allegheny, and by the Hainesport Mining & Transportation Company, owner of Lighter No. 17, against the steam tug Emily Marie, Nelson

H. Gildersleeve, John McAteer, and Anna. P. Ganer, claimants. Decree for respondents, and libelants appeal. Reversed.

Lewis, Adler & Laws, of Philadelphia, Pa. (J. Frank Staley, of Philadelphia, Pa., of counsel), for appellants.

Willard M. Harris, of Philadelphia, Pa., for appellees.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

BUFFINGTON, Circuit Judge. In the court below the lighters Allegheny and No. 17 each filed libels against the steam tug Emily Marie for damages resulting from their collision, while in tow of such tug, with the pier of a bridge spanning the Delaware river. On hearing, the court, in an opinion dismissed the libels. Thereupon the lighters each took an appeal, and as such appeals involve the same question we consider them both in this opinion. The pertinent facts of the case are well summarized in the opinion of the court below as follows:

"On the afternoon of November 8, 1915, the Hainesport Company engaged the tug Emily Marie to do some towing for it during the balance of that day. The tug was under the control of her own master and crew, and subject to the directions of the Hainesport Company only to the extent that she was to do such work as the company might direct her to do. She was, in fact, ordered to take a flotilla of lighters from a point on the Delaware river, above Philadelphia, to another point further down the same river. The flotilla consisted of nine lighters, eight of which were arranged in tiers of two each, thus making four tiers. The ninth lighter, the Allegheny, was at the extreme rear of the flotilla, made fast to each of the lighters in the fourth tier, so that she was approximately in the center of their sterns. The flotilla was made up under the directions of the master of the tug in the way it was, so that it would tow most advantageously. The Allegheny at the time was under charter to the Hainesport Company. In the first tier were lighters No. 24 and the Wilson Allen; in the second tier, lighters No. 22 and the Willie; in the third tiers, lighters No. 20 and No. 23; and in the fourth tier, lighters No. 17 and No. 14. The length of the flotilla as thus made up, including the Allegheny, and the length of the hawsers from the tug to the lighters of the first tier, was approximately 730 feet. In order to reach her destination, the tug had to pass under a bridge of the Pennsylvania Railroad, which spans the Delaware river, about a mile above Bridesburg. When the flotilla was about opposite the latter place, the tug Hainesport, which also belonged to the Hainesport Company, came alongside and removed the lighter No. 14, and directed the captain of the Allegheny to fasten the latter to the stern of No. 17, which was also owned by the Hainesport Company. This was done without the knowledge of the master of the tug and without his consent. After the No. 14 was removed and made fast to the tow of the Hainesport, the latter proceeded down the river, passing the Emily Marie on the starboard shortly before she reached the Pennsylvania bridge. The tide at the time was on the ebb, and the flotilla was making from four to five miles an hour. The Pennsylvania bridge was reached, the tug and the lighters in the first two tiers passed through safely, but the No. 23 scraped, fairly well aft, against the first abutment of the bridge toward the Pennsylvania side of the river, the No. 17 collided with it so violently that she was overturned, and the Allegheny hit it, head on, 3 or 4 feet from the starboard bow. It was dark, but clear, at the time of the accident, as it had been for some time previous. The width of the span of the bridge through which the flotilla was passing was about 500 feet, and the set of the current was toward the Pennsylvania shore. That an accident was likely was not discovered by those in charge of the tug until just before the collision, and when it was too late to avoid it. Both the No. 17 and the Allegheny were quite substantially damaged. It is the object of these suits to recover for such damages."

[1] Under such facts—a broad, open roadway; the lashings of the tow secure; the wind and water conditions favorable—it is clear that the passage through the span of the bridge in safety was one that should have been made, and the sinking of the two lighters, without any concurring fault on their part, against the pier, was so incompatible with the safe passage to be expected under such conditions that the burden rested upon the tug to exculpate herself from presumed fault. In The Steamer Webb, 81 U. S. (14 Wall.) 414, 20 L. Ed. 774, it was said: "There may be cases in which the result is a safe criterion by which to judge of the character of the act which has caused it." And we think this is a case of that kind.

[2, 3] This collision could not have occurred without the fault of some one, and, the lighters being without fault, it follows the fault is presumptively that of the tug, which was in exclusive control, unless she has shown the collision was the result of inevitable accident, or was caused by some agency other than the tug or tow. The W. G. Mason, 142 Fed. 915, 74 C. C. A. 83, and cases there cited. This the tug attempts to do by placing the blame on the tug Hainesport, which, as noted above, removed lighter No. 14 from the tow somewhat more than a mile above the bridge and nearly an hour before the collision. But assuming, for present purposes, the taking of No. 14 did endanger the tow's safety, the attempted exculpation, namely, that the Emily Marie did not know No. 14 had been removed and the safety of the tow thus endangered, far from exculpating it, only serves to make more glaring the fault of the Emily Marie. Moreover, it shows a course of ignorance of, or indifference to, the duty of a tug to a tow made up of nine powerless lighters. That the tug could simply take such a tow in draft, and then proceed without keeping it under observation, seems to have been the master's conception of his duty toward the tow. In that respect, he testified:

"Well, you can handle them better; they handle more like one boat, the shorter and closer, the better you handle them; you can swing them, and do most anything you want with them. Wherever the head boat goes, the rest must follow; *that's all you have to look out for.*"

To this standard of towage duty we cannot give our approval. That the master did not know the Hainesport had taken No. 14 from the tow the answer admits and the captain testified. That he could have seen the position of the two which struck the pier later, had he looked, is clear. The lighters had the regulation lights. A deck hand who was in the pilot house of the Emily Marie testified that he looked back and saw the Hainesport, and "she was right close to our tow, and I said she must be helping us"; and that the captain could have seen the condition of the tow, had he looked earlier, is shown by his own testimony that he did see its threatening condition when he looked just as the tug was approaching the bridge, and that he at once recognized the condition in which the tow had gotten. In that regard he says:

"Q. Before you entered the bridge under the span, did you look back at your tow? A. We always —. Q. What did you do on this occasion? A. When I entered the draw I looked back. Q. What did you see as you looked back? A. I was surprised to see the two hind boats in the condition they

were in; it looked to me as if they were going sideways. Q. If they continued, what would they do? A. I noticed it, and knew they would run the first two boats into the bridge; about that time the engineer opened her wide open, and I threw my wheel hard to port—threw the two head boats over to the abutment, to throw the tail end of the tow away from the abutment towards Jersey. Q. How long before that had you seen the condition of the tow? A. I looked back right then. Q. Before you noticed these barges sheering crosswise, how long had you looked back before, and what condition did you find it in? As you entered the bridge channel you saw then that you had to pull the tow over; now how soon before that had you looked back, and then how had you seen them towing? A. Three or five minutes. Q. How were they going? A. Going all right. Q. And as you were about approaching the bridge channel you looked back and saw the barges in that condition, these stern barges? A. Yes. Q. What condition were they in as you looked at them before? A. The Allegheny, the hind boat, was heading right for the Pennsylvania shore; I thought their lines had parted; I knew there was something wrong. Q. Could you see between the barge Allegheny and the barge ahead that there was a width there, a distance that you didn't observe before; is that what you mean? A. Yes. Q. When you saw these barges sheering in, what did you do with the tug boat? A. Pulled right for the Pennsylvania shore. Q. In an effort to do what? A. In an effort to pull the two head barges in tow to the abutment, to get a swing there to swing the tail end over. Q. What was done with your engine? A. Wide open. Q. Did your wheel and your engine have any effect in stopping the sheer of the last barges? A. No; they didn't. Q. What did they continue doing? A. They kept on and hit the abutment."

It will thus be seen that, if the Hainesport's taking lighter No. 14 from the tow and rearranging the Allegheny caused the two hind boats to turn sideways, as the captain of the Emily Marie testified, the failure of the captain to keep an oversight of the tow would still charge the tug with fault. Indeed, these heavily laden lighters must have been getting into this threatening position very slowly—a fact which shows the length of time the captain failed to look.

[4] But, in addition to this, the proofs tend strongly to show there was another fault of his, which we find contributed largely to the collision. The duty of the captain to know the flow of currents, tides, and like navigation conditions is clear under the decisions: The Webb, supra; Vessel Owners Co. v. Wilson, 63 Fed. 630, 11 C. C. A. 366; The Kalkaska, 107 Fed. 959, 47 C. C. A. 100. But the proof is that he did not, and was laboring under a mistake. After the accident, the explanation he gave of the collision was:

"Capt. Ganer was speaking to me about it, and I says, 'Captain, how did it occur?' and he says, 'I thought the tide set the other way from what it did.' He kept pretty well over to the Pennsylvania side, thinking the tide would carry him over, but unfortunately for him the tide didn't set that way. Q. When he conversed with you, did he say that he was in charge on the night of the accident? A. He said the tide set the other way, and that's the reason it happened."

Had the tug captain known the set of the tide toward the pier with which his tow collided, proper navigation would have kept him from passing in such dangerously close proximity to the pier as the tow was when it did pass. Without entering upon a discussion of other faults of navigation alleged against the tug, we are clear that the two faults charged against the tug, namely, failure to watch the

tow and failure to ·note the set of the tide, are sustained, and therefore the Emily Marie must be adjudged responsible to the libelants.

The decree below will therefore be reversed, and the cause remanded, with instructions to enter decree in favor of the libelants.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes