## THE CHARLOTTE.

(District Court, W. D. New York.   September 11, 1922.)

### No. 1165.

**1. Towage ⊜⇒11(7)—Tug held in fault for collision of tow with abutment in canal.**

A tug, with six canal boats in tow on Erie Canal, with such short tow-lines that their movements were controlled wholly by those of the tug, *held* in fault for collision of the starboard boats with an abutment; the fault being in not having a licensed pilot and in not making proper allowance for a gusty side wind.

**2. Admiralty ⊜⇒6—Vessel under charter to state pro hac vice not subject to suit for maritime tort.**

A vessel under charter to a state by a charter which makes the state owner pro hac vice, is not subject to suit for a maritime tort committed during the period of charter use.

**3. Shipping ⊜⇒41—When charterer is owner pro hac vice.**

A charterer of a vessel does not become owner pro hac vice, unless the possession and control is surrendered by the owner during the period of use specified in the charter party.

**4. Shipping ⊜⇒41—Charter held a demise which made the charterer owner pro hac vice.**

A charter party by which the owner did "charter and lease" a tug to the state of New York for the navigation season *held* a demise which made the state owner pro hac vice during the term, though the owner was to keep the tug in repair and furnish and pay the master and crew, where she was managed and controlled wholly by agents of the state, who made the contracts for her services.

In Admiralty.   Libels by George Wagner and by William J. Dolloff, against the steam tug Charlotte.   Decrees for claimant.

Brown, Ely & Richards, of Buffalo, N. Y. (John B. Richards and Lawrence E. Coffey, both of Buffalo, N. Y., of counsel), for libelants.

Stanley & Gidley, of Buffalo, N. Y., for respondents.

HAZEL, District Judge.   On July 7, 1919, the steam tug Charlotte, which is 95 feet long and 25 feet wide, had in tow in the Erie Canal, the canal boats Monk, Weed, Romayne, Pilbeam, and Mildred, all going light west bound, each 98 feet long and 18 feet wide, the Monk being 18 feet deep and the others 10 feet deep, except the Romayne which had a depth of 9 feet.   Five men, including the owners, Wagner and Dolloff, who were at the tillers of the Weed and Monk, respectively, were in charge of the different canal boats, which were fastened together in the following order:   The Weed (on the starboard side) and Pilbeam as a hawser team, and in their rear came the Monk, Reba, and Mildred, the Romayne being behind the Monk.   The Weed, Monk, and Romayne were arranged in tandem, securely lashed together at their ends for making a so-called triple-header tow, while the Pilbeam, Reba, and Mildred were securely lashed together to make a double-header tow.   Two hawsers were used, one running out from the bitts of the stern of the tug to the port side of the Pilbeam, and the other to the starboard side of the Weed.   The tow was almost wholly dependent in its movements on the towing tug, which was using a short line

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

or bridle, not exceeding 63 feet in length. The rudders of the two aⱡead canal boats were of small assistance, while those of the rear boats had no effect on the boats ahead. When the tow approached the Indian Castle stop gate, where the Erie Barge Canal ran straight, and where it was over 100 feet wide, the wind was blowing in gusts from 20 to 25 miles per hour from the south, and in consequence the canal boats tailed off a little to the north and starboard. There are three abutments at the stop gate, one on each side of the canal and a third in the center, leaving channels about 45 to 50 feet wide. In going through the north channel, the towing tug caused the Weed to strike the starboard abutment, to her damage, and to the damage of the Monk and Romayne. Competent wheelsmen, I find, were at the rudders of the respective canal boats, and a seasonable warning was shouted to the tug by Capt. Wagner that there was danger of striking the concrete abutment of the stop gate; but the tug continued ahead, with the result that the injury occurred.

[1] Two main questions are presented; the first relating to the fault for the disaster, and the second to the liability of the tug in view of her charter at the time to the state of New York. The tow, just prior to the mishap, was proceeding in the ordinary way, and no extra hazard was involved because the canal boats were fastened together in tandem and in tiers. In the exercise of ordinary care the tug was required to handle the tow without injuring the several canal boats, or any of them, through her faulty navigation. She has the burden of proof to show that the happening was not due to her carelessness and failure to exercise a proper degree of precaution in approaching the channel and in passing between the abutments, since the canal boats, fastened together as they were, were subject almost wholly to her movements and her deviations. Ordinarily tows, in navigating, proceed rather slowly and even decrease their speed, so as not to strike the piers or abutments at guard gates. It is not difficult to pass by one without impact, but in doing so the towing tug, to which the canal boats in their travel must be responsive, is required to exercise carefulness and precaution to avoid striking, and at such time the canal boats must help with their wheel or tiller to effect passing in safety. The Margaret, 94 U. S. 494, 24 L. Ed. 146. The respective canal boats, in my opinion, based on the proofs, were properly manned at the rudder or tiller to give assistance in passing the gate, and they followed the tug in her lead as nearly as possible. The evidence sufficiently shows, I think, that the Charlotte alone was at fault in failing to guide her tow properly toward the entrance to the guard gate channel, and in either failing to come more slowly or stopping to prevent colliding with the abutment. The shortness of the tow line permitted no divided responsibility, and she unquestionably became and was the dominant factor in the navigation. The Ft. George, 183 Fed. 731, 106 C. C. A. 169.

Nor would it exonerate her if it were held that the tow was improperly made up, for she was called upon to correct any irregularity in that respect and to keep the canal boats under constant observation and in proper condition for reasonably safe towing. The Allegheny,

252 Fed. 6, 164 C. C. A. 118. She was also required to navigate with regard to the wind, and to delay the trip, if necessary, instead of proceeding ahead to a position of danger or to a position where by the exercise of ordinary diligence and seamanship the disaster became unavoidable. The Mabey, 14 Wall. 204, 20 L. Ed. 881; Winslow v. Thompson, 134 Fed. 546, 67 C. C. A. 470. It was testified that as the tug entered between the abutments a flurry of wind suddenly blew the fleet to starboard, and her commander quickly swung over to port to avoid striking the abutment, but the canal boat on the right side did not clear and the damage ensued. In maneuvering to avoid the impact after putting the tow in a position of danger, the tug was not excused or exonerated. The mishap was not inevitable. The wind had been blowing in gusts for about an hour before the disaster, and it was the duty of the tug to navigate in respect thereto.

Engineer Reed, who was admittedly not a licensed pilot, had charge of her navigation. The tug, under its contract with the state, was required to have two pilots, one engineer, fireman, and two deck hands for her service of 13 hours daily. By Reed's testimony it appears that he had never before piloted a tug through the guard gate with the tow arranged in the manner it was. I think he failed to exercise good seamanship in attempting to take the tow through the guard gate channel, and as heretofore pointed out that he failed to properly direct the course toward the entrance, and to slow up or stop, either of which were feasible, to avoid colliding with the piers. He should have anticipated increasing danger to the canal boats from the intermittent gusts of wind and controlled the navigation accordingly. The tug Charlotte must also be condemned for not having a licensed pilot in charge of her navigation. It is claimed by respondents, among other things, that the canal boats were also to blame for failing to follow the tug into the stop gate, which was 50 feet wide, while the canal boats together were about 36 feet wide; but I find the evidence insufficient to sustain the claim.

[2] It is contended, however, that under claimant's charter with the state of New York, through its superintendent of public works, the state became owner pro hac vice, as distinguished from a contract of service or affreightment, and hence, if any damage was sustained, the state of New York alone is primarily liable, and liability against the tug after the charter ceased is unenforceable against her. In the recent case of The Western Maid, 257 U. S. 419, 42 Sup. Ct. 159, 66 L. Ed. 299, decided by the Supreme Court, the question submitted was whether a vessel under charter pro hac vice to the United States, which through her negligence had injured another during the time she was in possession and control of the United States, could be libeled for the damage sustained after the charter ended and the vessel was restored to her owners. The Supreme Court decided that neither the United States nor a vessel owned by it absolutely or pro hac vice could be held liable for maritime torts committed by her while engaged in the public service in war time; the basis for the decision being the sovereignty of the United States, and since the United States had not consented to be sued for maritime torts the action brought must fail

and the libel be dismissed. Prior to this the Supreme Court in State of New York v. Walsh, as Supt., etc., 256 U. S. 490, 41 Sup. Ct. 588, 65 L. Ed. 1057, decided June 1, 1921, a case arising out of the damage sustained herein, held that the state of New York possessed all the attributes of sovereignty possessed by the United States, and since a vessel owned by the United States or under charter to it pro hac vice cannot be sued for maritime torts, a vessel under a similar charter to the state of New York likewise could not be sued for maritime wrongs. See, also, State of New York v. Steam Tug Queen City, 256 U. S. 503, 41 Sup. Ct. 592, 65 L. Ed. 1063, decided June 1, 1921.

[3, 4] Such being the law, the question now arises whether, on the evidence adduced at the trial, the charter of the Charlotte to the state of New York amounted to a demise and possession thereof. It is libelants' contention that the tug remained in the possession and under the control of claimants at time of the disaster, and that therefore the libel is maintainable. It is unquestionably the law that a charterer of a vessel does not become owner pro hac vice, unless the possession and control is surrendered by the owner during the period of use or letting specified in the charter party. In the present instance the charter states that the "owner does hereby charter and lease," and though that description is not absolutely controlling, yet it must be given weight in the ascertainment of the intention of the parties. American Steel Barge Co. v. Cargo of Coal (D. C.) 107 Fed. 964. The fact that the owners were to keep the tug in good condition and repair her when necessary, clean the boilers once in three weeks, and furnish the master and crew and pay them, does not negative the plain import of the charter that from May 15, 1919, to some time between November 15 and December 15, when navigation closed, the tug would be in the possession, management, and control of the charterer. There are no reservations as to the operation of the tug. That her captain was under the directions and control of the superintendent of public works, even though appointed by the owners, is clearly shown, not only by the charter party but by the proofs.

It is not to be assumed that the charter was for affreightment, or merely for towage service, or for trips. In The Bombay (D. C.) 38 Fed. 512, the charter party embodied a somewhat similar provision to those contained in the charter in question and the court held that the charterers had control, management and possession of the vessel. In The India (C. C.) 16 Fed. 262, Judge Wallace decided that, where charterer obtains custody and control of the ship, an ownership pro hac vice is created, even though the general owner appoints the master and selects the mariners. In New Orleans v. U. S., 239 U. S. 202, 36 Sup. Ct. 76, 60 L. Ed. 227, the facts, I think, were essentially different. There the owner expressly assumed marine risks and, though he furnished the crew and master, the latter assumed the right to protest against commands that were received, thus showing, as said by the Supreme Court, that he regarded himself as representing the interests of the general owner, and not of the charterer. I have also examined Clyde Commercial Co. v. West India S. S. Co., 169 Fed. 275, 94 C. C. A. 551, and Munsen S. S. Line v. Glasgow Nav. Co., 235 Fed. 65,

148 C. C. A. 558, and do not find the facts in those cases to be the same as here.

In the present case it cannot be doubted that the superintendent of public works, during the whole season of navigation, directed the movements of the tug, and in his official capacity became a special owner. The testimony of libelants themselves is that they contracted with the agents of the state for the towage of the canal boats. It is my opinion, therefore, that the tug became answerable for her faulty navigation, and a liability for damage arose which, however, is unenforceable in admiralty against the sovereign state, engaged in public service without its consent. The principle of the cases heretofore cited is believed applicable on this point. Counsel for libelants evidently anticipated this ruling, and contend further that leave should be given to amend the libel, and that a decree in personam against claimants be rendered. That contention was based on the theory that the owners of the tug were in fault for having furnished the state an incompetent master and crew and an unlicensed pilot, in violation of section 17 of the Navigation Law of New York (Consol. Laws, c. 37). There are numerous cases, it is true, which hold that persons who undertake for a consideration to do certain things for a sovereign power are responsible for failure through negligence to perform, and are liable to the party injured. Little v. Banks, 85 N. Y. 258. But I must decline leave to amend, since I am of the opinion that the fault resulting in the damage was the fault of the state, which became the owner pro hac vice during the time specified in the charter, and liable for injuries to the canal boats in question.

It follows that the libels must be dismissed, with costs.