## THE JOHN E. ENRIGHT. THE WILLIAM C. FOX (COWLES, Claimant). THE CAPTAIN M. CHAPMAN.

District Court, W. D. New York. November 7, 1929.

William F. Purdy, of New York City, and Burke & Desmond, of Buffalo, N. Y. (Charles S. Desmond, of Buffalo, N. Y., of counsel), for libelants.

Stanley & Gidley, of Buffalo, N. Y. (Arthur E. Otten, of Buffalo, N. Y., of counsel), for respondent and claimant.

ADLER, District Judge. These two causes were tried together; each libel being for damage to a barge which was in tow of the tug William C. Fox on September 3, 1927. On that date the tug had in tow four barges, and, while east bound on the Barge Canal, had arrived at the entrance of Lock No. 12 in the Mohawk river at about 9 o'clock in the evening. The barges were loaded and were being towed tandem. The hawser from the tug was about 300 feet long. Then came the Enright, and lashed to the Enright and just behind it was the Chapman. It is the owners of these two boats who bring the libels that are being tried here. To the stern of the Chapman was another hawser about 250 feet

long. At the end of this hawser lashed together tandem were two other barges. These last two barges sustained no damage at this time, and are not concerned in this action.

It was dark when the fleet approached Lock No. 12. The evidence is that the water was high; that there was a pull toward the dam, which at this place was starboard of the boats going east. This had a tendency to draw the boats to starboard. The long wall at the approach to the lock was to the port side of the boats, the bullnose to the starboard side. The tug Fox checked speed on approaching the lock and entered the lock at a speed of about 1½ miles an hour. The Enright and the Chapman, in the order named, at the end of the long hawser came up to the long wall, but the captain of the Enright seemed not to be able to navigate very close to it. The steersman, Wall, was located in the bow of the Chapman, the second boat. He was also captain and owner of the Enright. The other captain and owner, La Fontaine, of the Chapman, was also on the Chapman as the boats approached the long wall. The evidence is that, when the steersman found out, just as he reached the long wall, that he was not going to make it very close, he called to La Fontaine to go forward on the Enright and get out a line. La Fontaine immediately did so, and a line was thrown over one of the niggerheads or posts on the wall. At this time the boats were about 10 feet away from the wall, drifting farther away on account of the high water and the pull of the water going over the dam. The steersman was unable to stem this pull to starboard by steering. The boat continued ahead with the headway that had been given to it by the tug and drifted to starboard toward the bullnose. La Fontaine, who was handling the line from the Enright to the post on the long wall, paid it out gradually as the drift of the boat to starboard compelled him to do so. He finally came to the end of the line, and the line broke. The starboard bow of the Enright went into the bullnose, and the boat was damaged. The Chapman, back of the Enright, bumping into her, was also damaged.

It appears that, when the tug Fox got into the lock, she stopped and began to shorten her hawser. Just how much the hawser had been shortened when the Enright bumped into the bullnose does not appear. Right after the Enright hit the bullnose, the tug with the shortened hawser, at that time there is some evidence that it was about 75 feet long, started ahead in the lock and pulled the two boats away from the bullnose and into the lock. In the meantime the last two boats of the tow had come up to the long wall safely and had tied up there.

It is the contention of the libelants that the tug, when it drew the first two boats of the fleet up to the lock with a hawser 250 to 300 feet long, and then abandoned them to the force of the drift caused by the high water, was guilty of the negligence which caused the accident. On the other hand, the tug contends that, when she had brought the two boats safely up to the long wall, she had done her duty; that it was then the duty of the boats to navigate themselves along the long wall and into the lock; that the injury to the boats resulted from the carelessness and the negligence of the captains of the boats in the handling of them at the long wall.

█ The tug owes a certain duty to its tow. It is the motive power, and, so far as it can do so, it must protect its tow from the perils of navigation. The Charlotte (D. C.) 285 F. 84. Rule 40 of the Barge Canal Rules reads as follows:

*"Length of Tow Lines:* In passing into and out of locks, no towing line in excess of fifty feet in length shall be used by towing floats."

It is the contention of the respondent tug that she complied with this rule when, after entering the lock, she began to shorten the tow line.

█ My conclusion is that the tug did not do her full duty in this case. She brought her tow up to a point where there was some danger to the tow, and then abandoned it. She abandoned it because, when the tug stopped inside the lock and the long towline slackened up, the two first boats of the tow were left to drift in the pull to starboard of the water unless they were able to steer against that pull. This they were not able to do. I think it is very clear that, if there had been a short hawser from the tug to the first two boats of the fleet, and the tug had continued into the lock keeping that hawser taut, the accident could not have occurred. The water conditions at that time and at that point were known to the captain of the tug, and I am of the opinion that the tug did not in the conditions in this case fulfill its duty to its tow.

These actions are brought in rem against the tug, and a maritime lien must be shown to sustain them. The tug Fox was during the navigation season of 1927 under charter to the Independent Towing Company. This charter provided in terms that it was the intention to transfer the entire dominion and control of the boat, and of the operation and

navigation thereof, to the Independent Towing Company. There was an agreement introduced in evidence between the owners of the two barges, libelants here, with the same Independent Towing Company. It is the contention of the respondent that under these agreements the tug and the barges were at this time under joint ownership pro hac vice; that therefore there could be no maritime lien and that these actions in rem could not be maintained.

I have carefully examined the agreement between the independent barge owners and the towing company. In my opinion it does not transfer to the Independent Towing Company dominion and control of the barges to bring the case within the ruling and decision of The Dutchess (D. C.) 15 F.(2d) 198. I am not persuaded that the cases recited by respondent, which appear to hold, under a similar agreement, that the tug and barge are one vessel when the question of taking advantage of the Harter Act (46 USCA §§ 190–195) is involved, are at all in point here.

My conclusion is that in both cases the accident was due to the negligence of the tug. Decrees accordingly may be submitted.