## THE R. LENAHAN, JR.

## THE CARLOTTA.

## THE JOHN J. RYAN.

District Court, W. D. New York.
May 14, 1930.

Single & Single, of New York City (William J. Mahar, of New York City, of counsel), for libelant Thomas F. Reddy.

Macklin, Brown, Lenahan & Speer, of New York City (E. F. Lamb, of New York City, of counsel), for libelants Bethlehem Steel Co. and Mary Ryan.

Barry, Wainright, Thacher & Symmers, of New York City (Paul L. Clugston, of New York City, of counsel), for libelant Continental Grain Co.

Stanley & Gidley, of Buffalo, N. Y. (Arthur E. Otten, of Buffalo, N. Y., of counsel), for respondent.

HAZEL, District Judge.

We are concerned herein with four libels in rem, separately filed by cargo owners and owners of barges to recover damages sustained on November 16, 1926, at Fonda, N. Y., arising from the alleged negligent towage of the tug Carlotta and resulting in grounding of the barges R. Lenahan, Jr., laden with 600 tons of pig iron, and John J. Ryan, laden with 20,000 bushels of wheat. The tow, starting at Buffalo, went eastward on the Erie Barge Canal destined to Waterford, N. Y., closely coupled in tandem, the Lenahan being ahead boat, and the Ryan, having a Gillies steering wheel, second. On June 15, 1928, an order of consolidation of the four libels against the tug Carlotta and claimant was entered, and the trial by agreement proceeded as a single case. Different proctors represented separate interests, and the fault of the tug was somewhat differently alleged in the libels, but the principal

acts of negligence in towing relied upon were:

1. The unskillful operation of the tug at or near the Fonda terminal in attempting to warp the tow to the dock.

2. That the tugboat should have, in view of the existing conditions, tied up before arriving at Lock No. 13 or remained in the lock for safety.

3. That the tug should have anchored and instructed the barges also to anchor after leaving Lock No. 13 to avoid mishap.

4. That the Carlotta was unseaworthy to tow the barges at this season of the year.

The answer denies negligent operation and alleges that the grounding was due to:

1. Vis major owing to abnormally high water and current encountered.

2. That no recovery may be had under the charters by the barges, inasmuch as the Iroquois Transit Corporation was owner pro hac vice of both tug and barges.

3. That, in any event, the cargo owners cannot recover under section 3 of the Harter Act (46 USCA § 192).

The Carlotta, a motorboat, is about 60 feet long and 12 feet beam, and has a 100 horse power Diesel engine, while the barges are each more than 100 feet long and about 23 feet wide. They were hooked up on a 300-foot single hawser extending in the customary way from the tug to the ahead barge.

Heavy rain and highwater were encountered in the Mohawk river between Locks Nos. 17 and 13 which were separated by a distance of about 23 miles. The level of the canal, both west and east, rose gradually throughout the day from the time the tow passed Little Falls and was considered unusually high at 5:30 p. m. just before arriving at Lock No. 13, which is the last lock west of Fonda. In anticipation of difficulty, the master of the tug requested permission of the lock tender to tie up at the wall outside the lock, or remain within the lock, but permission, he and the mate testified, was refused. The lock tender, however, contradicted their testimony, claiming that he refused permission to tie up at the approach wall outside the lock, and said that the tow might remain in the lock chamber, and that the master, without assigning any reason, replied that he would proceed to Fonda about 5 miles distant. Before leaving, the lock tender admittedly stated that, owing to the high water, it would be necessary for him to open additional gates of the dam, but that he would wait until the tow got away from the lock. After the tow had proceeded a distance of a mile or a mile and a quarter, a total of 10 gates were opened by the lock tender with the result that volumes of water poured into the channel, the current running strong in an easterly direction. Its normal strength, the witnesses say, was approximately 1½ to 2 miles an hour, which was increased by the open gates to 4 or 5 miles an hour and appreciably accelerated the travel of the tow.

The master and mate of the tug testified that upon reaching a bend in the channel about ¾ of a mile from the Fonda terminal, the bargemen were signaled to let go the hawser; that the tug then turned about and came to the starboard quarter of the rear barge preparatory to shoving both barges to the north bank. The bargemen, Catman and Moley, swore that this maneuver was not attempted at the time stated; that they had previously shouted repeatedly to the master, when the tow was approximately a mile from the terminal, to let go the hawser and shove the barges toward the bank, but, instead of doing so, he delayed and came to the rear barge to execute the movement, after letting go the hawser, when about 100 feet west of the terminal wall.

The weight of the testimony, I think, supports the version of the bargemen. The expert witnesses for respondent expressed the opinion that the tow could have been successfully brought to the terminal if the tug had backed to the stern of the tow a quarter of a mile west of the terminal. Her delay in this particular made it clearly difficult, if not absolutely impossible, to warp the barges to the dock. The delay, in my opinion, was the proximate cause of the stranding. It is true that, after the Carlotta passed a 75-foot line at the rear of the last barge, the tug exerted herself in a westerly direction to overcome the force of the current and move the tow towards the dock, reducing the speed easterly to about 2 miles an hour. This would seem to warrant the inference that she was not lacking in power, though failure was attributed by the master thereto. But I think the proofs show that, if the movement had been attempted earlier and more cautiously, it would have succeeded. Instead, the barges passed the dock and grounded on a riprap abutment outside the channel a few hundred feet below and the tug was unable to release them. Subsequently the cargoes were lightered and damage, specified in the libels, sustained to the cargoes and the barges. Permitting the stranding of the barges

outside of the navigable channel was a prima facie fault on the part of the towing tug, and the burden rests upon her to satisfactorily explain the mishap. This has not been done. Although the tug was not a common carrier with relation to the tow, it was nevertheless required to exercise reasonable care in the towage movement, and since the master no doubt realized, or should have realized, the strength of the current, he was bound in the exercise of his duty to skillfully and seasonably initiate the warping movement toward the dock at a point where in all probability it would have succeeded. The Convoy, 12 F.(2d) 93; and compare The Wyomissing (C. C. A.) 228 F. 186; L. B. Shaw v. Bethlehem Steel Co. (C. C. A.) 18 F.(2d) 1017.

█ It is shown by the evidence of Moley, Cramer, and Carrity that the tug and barges were fit and staunch when the voyage began; and the facts and inferences in their entirety establish that the tug had sufficient power at the start for control and navigation of the barges and their cargoes. And, even though the high water and current interfered with shoving the barges to the Fonda dock at the point where the maneuver began, because of insufficient tug power, it is doubtful whether unseaworthiness may be attributed to her on that ground. The Mary T. Tracy (C. C. A.) 8 F.(2d) 591. The expert McQuivey expressed the opinion that opening the gates presented a worse condition than he had ever encountered in his experience of 25 years of canal navigation. Even though informed by the lock tender that other gates would, shortly after the tow left the dock, be opened, the resultant severity of the created current and its effect could not have been anticipated.

█ I find that both tug and barges were seaworthy at the beginning of the transportation, and that the tug had capacity to overcome any danger from ordinary high water due to prevalent rains. I am unwilling to accept the explanation of inevitable accident, notwithstanding the strong current resulting from opening the gates of the dam. It was the duty of the tug, in order to sustain this defense, to eliminate all possible causes by proving that the stranding of the barges could not have been prevented by the exercise of reasonable care. The Lackawanna (C. C. A.) 210 F. 262, 266. I am also of the opinion that Capt. Cramer was negligent in not mooring or anchoring the tow, for concededly there were several places at which it could have been done before reaching Lock No. 13. He was also at fault in not sheltering within the lock chamber, as he might have done. I discover no reason for ignoring the disinterested testimony of the lock tender on this point.

I now take up for consideration the defense of nonliability under the charters in question. Respondents contend that the stranded barges have not proved a maritime lien against the tug on the ground that the Iroquois Transit Corporation, the charterer (which is not a party to this proceeding), was owner pro hac vice of both tug and barges; that the terms of the charter of the barges Lenahan and Ryan (Form Exhibit 1) constituted a demise and ownership pro hac vice, and that the testimony of the witness Davidge of the Iroquois Transit Corporation likewise shows ownership pro hac vice of the tug Carlotta.

██ It must be shown, before there may be a recovery by libelant, that a maritime lien eventuated as the basis of this action in rem, for, if the Iroquois Transit Corporation was in possession and control of the tow at the time of the disaster, having acquired the same by demise, leasing, or letting during the season of navigation, then the owners of the barges acquired no maritime lien against the tug.

█ Davidge testified that the charter of the Carlotta was by word of mouth, confirmed by letter; that it provided for a per diem rate of $90 during the season of 1926; that it was agreed that the owner would man and equip her, furnish the fuel and provisions, and pay the crew; that the movements of the tug during the entire season of 1926, as to what she should do in the way of shifting boats and barges in the harbor and towage to distant points, were directed by the charterer; and that the rate was payable regardless of whether the Carlotta was in actual use or not; also that the contract included the supervision of the services of the crew by the charterer and right to request dismissal of any member who failed to give satisfaction. He was asked whether the transit company had any control over the navigation of the tug, and replied that it just issued orders where to go. He also testified that both barges were under written charters to the company for the canal season of 1926; that the charters, which had been mislaid or lost, were of the standard form similar to Libelants' Exhibit 1. The form states that the owner hires and leases the barges Lenahan and Ryan to the charterer, manned, equipped, and seaworthy at a specified rate per diem, the owner to assume

all expenses incident to their operation and maintain a competent captain thereof; and that the owners shall promptly obey all orders of the charterers. Such a charter of a boat having no motive power is a demise and made the charterers bailee. Dailey v. Carroll (C. C. A.) 248 F. 466; Hastorf v. Long (C. C. A.) 239 F. 852. Under such an engagement the charterer is responsible to the owner of the scow for damages sustained to her through the negligence of its servants. O'Brien v. City of New York (C. C. A.) 9 F.(2d) 542.

Libelants contend that it is clearly shown that the Iroquois Transit Company under the agreement did not become owner pro hac vice. I must confess that some of the adjudications cited as applied to the instant case are not as clear as contended. The essential thing is to construe the agreement correctly in connection with the actions of the parties thereunder. U. S. v. Shea, 152 U. S. 186, 14 S. Ct. 519, 38 L. Ed. 403.

It was not simply a particular service or hiring for a specified transportation of cargo from one place to another, since the charterer, as already stated, retained possession, control, and command of the tug. The movements of the tug in and about the harbor at Buffalo, and later for a towage, were at the command of the charterer, and that the general owner hired the master and crew and paid them and supplied provisions does not alter the relationship created by the charter.

In Leary v. U. S., 14 Wall. 610, 20 L. Ed. 756, and U. S. v. Shea, supra, it is substantially ruled that the charter party must be taken in connection with the actions of the parties. The connection here is clearly evidenced, it seems to me, by letting the tug with the entire right to direct her navigation, the right to determine the nature of her work, the right to order her for work at one place or another either for placing barges in the harbor or proceeding upon a towage transportation of merchandise, or remaining idle without in either instance consulting the general owner, thus establishing a pro hac vice ownership in the Iroquois Transit Corporation, as distinguished from a use for a designated service or single towage. It has frequently been held that furnishing supplies and appointing a master and crew and paying them did not alter the primary relations between the parties; and in American Steel Barge Co. v. Cargo of Coal (D. C.) 107 F. 964, it was held that an oral agreement or charter is entitled to a liberal construction with a view of carrying out the real intention of the parties. In the Leary Case, relied on by libelants, the charter party contained a restriction as to the use of the vessel, that only certain goods, at the instance of the government, should be received on board, and that the owner reserved the right to refuse other goods. There was no reservation whatever as to the use or possession of the tug Carlotta. I am unable to distinguish this case from The Charlotte, decided by this court in 1922, reported in 285 F. 84 affirmed (C. C. A.) 299 F. 595, certiorari denied 266 U. S. 604, 45 S. Ct. 91, 69 L. Ed. 463), wherein it was ruled that a charter and lease of the tug to the state of New York for the season of navigation was a demise which made the state owner pro hac vice during such time. In that case the owner was to keep the tug in repair and pay the master and crew, leaving her management with the agents of the state.

It is therefore held herein that, since the Iroquois Transit Corporation acquired dominion and control as owner pro hac vice of the barges Lenahan and Ryan and the tug Carlotta, no maritime lien eventuated as against the latter. The Dutchess (D. C.) 15 F.(2d) 198; The Dutchess (The City of New Bern) 16 F.(2d) 1003 (D. C.).

Respondents also take the position that the cargo owners Bethlehem Steel Company and Continental Grain Company cannot recover against the tug, in view of the provisions of the Harter Act (title 46, § 192, US CA) exonerating the tug and general owner from liability. In Sacramento, etc., v. Salz, 273 U. S. 326, 47 S. Ct. 368, 71 L. Ed. 663, the Supreme Court decided that, where the owner of a barge having no motive power transports merchandise and uses a tugboat or steamer owned by him, the two instrumentalities operate as a unit to transport the cargo and come within section 3 of the Harter Act (46 USCA § 192) which reads as follows: "That if the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel. * * *"

In this case, the Iroquois Transit Corporation, by its barge and tug charters, created a joint ownership pro hac vice within the principle of In re O'Donnell (C. C. A.) 26 F.

(2d) 334. There, as here, the barges and towing tug were deemed seaworthy and properly equipped and manned at the beginning of the trip, and the learned court treated the tow as a single vessel for transportation. It is evidenced that the possession and control of the Carlotta and barges were obtained prior to the contract of carriage or affreightment, and, even though this court is in error in deeming the transit company owner pro hac vice of the tug and barges, and the charter of the tugboat was merely a time charter arrangement, respondents, in my opinion, are nevertheless entitled to the benefits of the Harter Act. The fact that in Sacramento, etc., v. Salz, a bill of lading was issued and the cargo owner proceeded in personam instead of in rem, and that the carrier was absolute general owner of the barge and tug, is not of material importance.

██ Libelant also contended that Capt. Cramer, the navigator of the tug, was incompetent and not provided with a proper license, but I do not regard that he was incompetent to navigate the tow or execute the proper movement to shove the barges to the Fonda dock or to tie up the tug either before reaching Lock No. 13 or within the lock. His motorboat license was some evidence of his competency to properly handle her, though a license (section 515, Title 46 USCA) was only required in cases wherein a motor craft carried passengers.

The libel alleges other grounds for holding the tug responsible, but they were not substantiated; and other questions of liability or relief from liability were argued at the bar, but, in view of the foregoing, it is unnecessary to pass upon them. A decree may therefore be entered dismissing the consolidated libels against the respondents, with costs.