## THE TOURIST.

### SEABOARD FORWARDING CO. v. FREIGHT ON CERTAIN CARGOES OF FLAXSEED (two cases).

(District Court, W. D. New York. October 28, 1926.)

1. Towage ⬥19—Tug, whose tow collided with center abutment of guard gate on canal, held at fault in not having gradually slowed, and in not keeping to starboard.

Tug, whose tow of barges collided with center abutment of guard gate on Erie Canal, held, on libel by shipper of goods on barges, at fault in not gradually reducing speed on approaching gate, to prevent disturbing back wash from abutment, and in not navigating so as

to avoid or counteract cross-currents, by proceeding further to starboard, thus holding barge firmly in line and directly astern.

**2. Towage ⬦4—Tug, towing barges, must in everything relating thereto exercise reasonble skill and care.**

Tug, while not common carrier or insurer when engaged in towing barges, is required to exercise reasonable, skill and care in everything relating to the work till it is accomplished.

**3. Shipping ⬦121(2)—Second barge of tow, which collided with pier of guard gate on canal, held, on libel by shipper, unseaworthy, not having steering equipment.**

Second of tow of box barges, which collided with center pier of guard gate on Erie Canal, held, on libel by shipper of goods on barges, unseaworthy in not having steering equipment, which in all probability would have avoided mishap.

**4. Towage ⬦19—All of barges of tow carrying for same shipper held not liable for fault of one in not having steering equipment.**

Though all of barges of tow were carrying grain for same party, held, on libel by shipper, that they were not liable as single vessel for fault of one in not having steering equipment.

**5. Shipping ⬦132(5)—Evidence held not to show carrier by barges abandoned contract of carriage on towing tug declining to proceed.**

Carrier by barges held not shown by the evidence to have abandoned contract of carriage, on towing tug declining to proceed.

**6. Shipping ⬦148—Deduction from freight must be made for shipper's expense for tug to complete trip, on tug hired by carrier quitting.**

Shipper of barges held entitled to deduction from freight of expense of tug hired by him to complete trip, on tug hired by charterer of barges refusing to proceed.

**7. Shipping ⬦150½—Pledge of freight money for advances to complete trip and for running other boats held valid.**

Freight money of cargoes may be pledged or hypothecated for advances to assist consummation of trip and for running other boats; pledges being for maritime purposes.

**8. Shipping ⬦148—Shipper cannot counterclaim against freight money claim for fault in another independent shipment.**

Claim of shipper against carrier for fault of barge in tow carrying one shipment cannot be set off or counterclaimed against freight money owing by same shipper for shipment on other fleet of barges; it not arising out of the same transaction or contract.

**9. Shipping ⬦148—No exception to rule against counterclaiming for damages from other shipment arises from carrier's bankruptcy.**

Bankruptcy of carrier does not raise exception to rule that shipper cannot counterclaim damages arising out of different and unconnected transportation.

**10. Shipping ⬦130—Carrier held not at fault for proceeding with contract after barges' collision at canal gate.**

Notwithstanding collision of barges at canal gate, held, carrier was at fault in proceeding to carry out contract of affreightment.

**11. Shipping ⬦146—Full freight under bill of lading must be paid by shipper, who in course of transportation requires return of goods.**

Where shipper in course of transportation requires return of goods to shipping point, he must pay full freights under bill of lading.

In Admiralty. Libel by Spencer Kellogg & Sons, Inc., against the steam tug Tourist and tow, consisting of the canal boats H. M. Stagg and three others, and two libels by the Seaboard Forwarding Company, one against the freight on cargoes on the barges Freedom and two others, and the other against the freight on cargoes on the barges H. M. Stagg and three others, in each of which Spencer Kellogg & Sons, Inc., shipper, denied liability. Decrees in accordance with opinion.

Dudley, Stowe & Sawyer, of Buffalo, N. Y. (Joseph G. Dudley and Harry J. Kelly, both of Buffalo, N. Y., of counsel), for libelant Spencer Kellogg & Sons, Inc.

Thomas C. Burke, of Buffalo, N. Y., for libelant Seaboard Forwarding Co.

Stanley & Gidley, of Buffalo, N. Y., for claimants Hammond and O'Boyle.

HAZEL, District Judge. We are concerned herein with separate proceedings in admiralty, viz. a libel in rem by Spencer Kellogg & Sons, Inc., against the tug Tourist and tow to recover for negligent navigation resulting in damage, and a libel in personam by the Seaboard Forwarding Company against the freights arising out of the transportations in various canal barges from Buffalo to Edgewater, N. J., by way of the Erie Barge Canal, of large quantities of flaxseed of the approximate value of $250,000, owned by Spencer Kellogg & Sons, Inc. The Waterways Navigation Company (hereinafter, for convenience, called the Navigation Company) was charterer of the canal barges in question, while the Seaboard Forwarding Company (called herein the Forwarding Company), located at Buffalo, acted as forwarding agent and was assignee of any earned freights. The freights on the first fleet, comprising the barges Freedom, Adam Schumann, and L. E. Schumann, amounted to $6,968.92; but Kellogg & Sons denied liability claiming to have an equitable right of set-off or counterclaim arising out of the negligence of the Navigation Company, which was also the charterer of the second fleet of

barges, viz. the H. M. Stagg, Rose O'Boyle, Hammond Bros., and Lake Superior, all carrying flaxseed, and which, en route on December 2, 1924, collided with the center abutment of the guard gate No. 12 west of Brockport, all the barges sustaining slight damage. The agreed freights on the last-mentioned shipment amounted to $9,004.26, and the shipper denies liability on the ground that the freights were not earned, owing to the unseaworthiness of the barges at the beginning of the trip; also denying that the Forwarding Company had any interest in the freights of either fleet.

[1, 2] It will be convenient to first treat of the libel in rem. Libelant claims that the tug Tourist, which had the second fleet in tow, was at fault for unskillful towage, and that the four barges were primarily at fault, in that they were not equipped with steering wheels, so as to enable steering and managing the tow. The barges of the second fleet had on board 102,906 bushels of flaxseed, with which they were laden on November 28, 1924. It is shown by the evidence that at the time of the disaster the barges were coupled closely in tandem, the Stagg ahead and the O'Boyle astern, followed by Hammond Bros. and Lake Superior, and towed by the tug Sidway, which, however, was relieved at Heinsburg and the tug Tourist substituted to complete the voyage. Upon reaching the guard gate, the Stagg suddenly veered over towards the center abutment. The speed of the tow was at the rate of 1½ to 1¾ miles an hour, and, in the exercise of proper care, in view of the circumstances, the tug, in my opinion, should have slowed down on approaching the guard gate. Her speed should have been gradually reduced to keep her tow in alignment with her in passing through. The evidence is also open to the inference that she failed to retain a taut hawser, as she should have done.

The witness Castle, the first mate of the tug, who was at the wheel, testified that in approaching the stop gate speed was not reduced, and that the stern of the tug went to starboard, which, it may be conceived, checked the swing of the Stagg to port and slackened the hawser—a double hawser somewhat shorter than is customarily used—which extended from her right and left corners to the stern post of the tug, a distance of 60 or 70 feet, or about 50 feet from the stern of the tug to the bow of the barges. The master of the tug was not produced as a witness, and Castle's experience in tug navigation concededly was limited. He had never before towed box barges (which are square at the bow) coupled in tandem.

In his explanation he stated that he understood that the tow sheered, owing to the back wash of the water heaped up against the abutment. At this point the navigable water, he says, was 50 feet wide, and the tug was proceeding through the gate close to the center abutment. The manner in which the barges were navigated, on short lines in a straight channel, practically put them under the control of the tug, which obviously was a dominant factor in the navigation of her tow. She was remiss, as already remarked, in not gradually reducing speed preparatory to passing through the gate; for, had her speed been bare steerageway, there would not, in my opinion, have been any disturbing back wash or interfering cross-current. She should have been navigated to avoid interfering cross-currents, or have counteracted them. This could have been done by proceeding somewhat further to starboard, which would have held the Stagg firmly in line and directly astern of the tug. Although a steam tug is not a common carrier or insurer, when she engages in towing a fleet of barges, she is required to exercise reasonable skill and care in everything relating to the work until it is accomplished. The Margaret, 94 U. S. 494, 24 L. Ed. 146.

[3] Libelant, however, insists that the barges were at fault because of the failure to use and adjust a steering wheel on the bow of the O'Boyle, the second barge, so that the ahead barge and the tow could be steered when steering was necessary. The barges were of a type called New York Harbor barges, which are commonly used in the New York Harbor, and which, in recent years, have come into use on the Barge Canal. They are not equipped, when in use in New York Harbor, with steering equipment, and it was claimed that they invariably follow the tug, without being steered, when towed on two hawsers approximately 100 feet long. But I am nevertheless unconvinced that these barges are seaworthy in the canal without proper steering equipment.

Regulation 2, governing navigation of the Barge Canal, provides that "every boat navigating the canals shall be equipped with a rudder and a wheelsman, who shall be constantly on duty at the wheel, except such boats as are so constructed as to tow safely on two hawsers or use other suitable steering equipment, and have permission from the commissioner of canals and waterways or his representative." That barges of the box type have a tendency to sheer fairly appears by the testimony of the witness McGuivey; and, though he testified that in his opinion the so-called Gillies wheel was of little use

for steering, yet he admitted that he had towed harbor box barges on a short hawser that were equipped with steering wheels, and that they are used in many instances, adding that "there are a great many occasions when you do not want them used."

Baker testified that the only need of Gillies wheels on these barges is to hold them close together; that they are not used for steering. But, when he was asked the question, "What is the use of a Gillies wheel on a harbor box?" he answered: "The tow is drifting along; and where they put in these abutments, sometimes they stick out a couple of inches, or there is a jog, or something of the kind. Well, when the bow goes along and catches that, they can drift in there and pull it out." This, to my mind, implies a situation where a steering wheel, properly placed, is useful in turning boats in the canal to avoid contact with the bank or abutments, and keep the tow directly astern of the tug.

The expert, Holmes, testified that the Gillies wheel for steering a tow is commonly used on canal barges and is ordinarily placed at the stern of the ahead barge or at the bow of the second and by its leverage is capable of assisting, under certain circumstances, the lateral movements of the entire tow.

Starboarding, as testified by Castle, when in the middle of the channel, and when the bow of the Stagg was about 9¾ feet from the abutment, caused a pull on the left line of the double hawser, which, no doubt, produced a slackening of the line on the right. If there had been a steering wheel operated on the bow of the O'Boyle, it would have aided in preventing the latter from lapping the pier. On the other hand, if it be assumed that the Stagg sheered toward the abutment, a steering wheel with a slackened line, skillfully used, in all probability would have broken the sheer. Such was also the opinion of Holmes, whose experience in canal navigation and in the types of canal barges used, is entitled to weight.

The O'Boyle, I find, was unseaworthy, since it is sufficiently shown that a steering equipment, properly placed on her and hooked up to the Stagg, and skillfully used, in all probability would have avoided the mishap.

[4] Libelant contends that, as the four canal boats were coupled close together in tandem and navigated under common direction, engaged by the same charterer in a joint service, they were practically a single vessel, and must be held jointly at fault. The Bordentown (D. C.) 40 F. 683, a decision by Judge Brown, of the Southern district of New York, fairly supports the principle, in certain instances, of joint liability; but the case of the W. G. Mason, 142 F. 913, 74 C. C. A. 83, decided by the Circuit Court of Appeals for this circuit, does not seem to be in accord with the principle therein announced.

In that case two tugs belonging to the same owner were engaged in towing the steamer Gratwick in this port under direction of the ahead tug, while the rear tug was managed and controlled by her master. The learned court held that, though both tugs were engaged in a joint enterprise and were owned by the same owner, they nevertheless could not be jointly held for the tort, for the reason that blame was attributable to one of the tugs only. Judge Wallace, who wrote the opinion for the court, substantially stated that the fact that the two tugs were to be regarded as a single vessel, and engaged to carry out a joint undertaking, did not have the remotest bearing upon their respective liabilities in rem, and he said: "A tug and her tow are deemed a single vessel under steam, within the meaning of the rules of navigation for preventing collisions; but it has never been asserted elsewhere that they could be regarded as one vessel for the purpose of ascertaining their relations as between themselves, or their several liabilities to respond for the consequences of the fault of one of them. Even when two vessels are lashed together, the question of liability of each always depends upon ascertaining whether that vessel was in fault." This principle, he proceeded to point out, arises from the tortious act of the particular vessel at fault, independent of any contractual considerations.

It is now necessary to treat of the liens or claims upon the freights of the seven canal barges in question, and of the asserted right to set off the collision damages against the freights of the first fleet, which transported safely 78,000 bushels of flaxseed at the rate of 8¾ cents per bushel. There was right delivery on December 11, 1924, and the freights, with demurrage charges, amounted to $6,968.92. It is proven that the Forwarding Company earned commissions for procuring the cargoes for the Navigation Company in 1924, as its agent, and had, on prior occasions, paid the running expenses of other canal boats not concerned herein, and that, to secure such advances, the freights of the canal boats in question, amounting to $4,705.05, were hypothecated by the Navigation Company to its agent, the Forwarding Company.

The bills of lading on the three cargoes comprising the first fleet expressly stipulated that the freight charges and demurrage should be paid by check to the order of the Irving National Bank of New York, the check to be delivered to one Petrie, for the bank, and the balance of the freights retained by Petrie. The arrangement discloses that the bank and Petrie were agents of the Forwarding Company to collect the freights under the bills of lading. Out of the balance of the freights collectible by Petrie, viz. $2,278.87, was to be paid commission of $195 to the Forwarding Company, and the remainder of $2,268.87 to the Navigation Company. While the first fleet was in transit, additional advances to meet running expenses were made by the Forwarding Company, and as security the Navigation Company, orally and in writing, turned over to it the balance of the freights.

Subsequently, on November 26, 1924, as heretofore mentioned, there was made another shipment by Kellogg & Sons, Inc., on the second fleet, of 102,906 bushels of flaxseed, also to be transported from Buffalo to Edgewater at the rate of 8¾ cents per bushel, and to secure the commissions for procuring the cargoes and for advances to meet transportation expenses, the freights to the amount of $7,153.56 were also hypothecated, under the bills of lading, to the libelant the Forwarding Company. It was provided that the latter freight charges and demurrage should also be paid by check to the Irving National Bank, Petrie to retain the balance, pay libelant the commissions, and deliver the remainder to the Navigation Company. An assignment of the last-mentioned balance of freight collected by Petrie was made to libelant by the Navigation Company as security for additional advances for running expenses made by it.

[5, 6] It is now necessary to recur to the collision between the Stagg and the abutment. The Navigation Company denied fault, and asserted that the canal boats, notwithstanding the lateness of the season and weather conditions, could safely continue the trip, while Kellogg & Sons, fearing interference from freezing of the canal, demanded a redelivery of the cargoes at Buffalo, and offered a bond to secure any freight that might be due, but without prejudice to any right of action or offset it might have. The Navigation Company, however, insisted upon their right to go forward to earn the stipulated freights, and accordingly the boats proceeded eastward on the trip. But on December 10th, on their arrival at Macedon, the Navigation Company yielded to the request of the shipper to return the cargoes to Buffalo, on condition that it would receive the full freights under the bills of lading. This proposal was accepted, but without prejudice to the legal rights of the shipper against the Navigation Company and the tug and barges. On the way back, however, the owners of the towing tugs at Pittsford declined to proceed further, claiming that their charter hire had not been paid. There was delay, and the shipper contends that the contract of carriage was abandoned.

It was evidenced that the witness Doran, acting for the Forwarding Company went to Pittsford to hire other tugs to complete the return, but was informed, he says, by Holmes, who acted for the shippers, that arrangements had already been made by the shipper with the Cowles Towing Company to tow the boats back, and that a tug was then on her way to carry out the engagement—an engagement which finally resulted in delivering the cargoes undamaged at the shipper's elevators on December 23, 1924. Payment of the freights was thereafter refused, although the Forwarding Company, assignee of the freights, was willing that the tug expense for returning the cargoes should be deducted. I find that the evidence does not show abandonment by the charterer, or the assignee of the freights, of the agreement to return the cargoes. It is quite believable that Doran would have succeeded in hiring tugs, if the anxiety of the shipper, which no doubt was justified, as to the safety of the cargo, had not resulted in the employment by it of the Cowles tugs. The expense of these tugs, of course, must be deducted from the freights.

[7] The freight money of the cargoes on the two fleets having been hypothecated to the Forwarding Company, the question arises whether the liens were valid and enforceable. The contention of Kellogg & Sons is, in the main, that because of the disaster to the second fleet and the insolvency of the Navigation Company, which was known to the Forwarding Company, the pledges were invalid. The evidence does not warrant such a finding. The advances were made largely to assist the consummation of the trip, on the pledge or hypothecation of the freights. They were made for maritime purposes; making some of the advances for running other boats is not of material importance, since maritime liens on the freights may be pledged or assigned, without limiting them to specific maritime transportations. Freights of the Kate (D. C.) 63 F. 707. They may be

general in terms, but general liens or pledges of freights may be inferior to specific pledges for advances in aid of the transportations.

[8, 9] As to the asserted set-off, the claim against the Navigation Company, arising from the fault of the barge Rose O'Boyle in not having a steering wheel to avoid any sheer of the tow, cannot, in my opinion, be set off against the freights of the first fleet. The asserted set-off or counterclaim has not arisen out of the same transaction or contract, and has no connection with the mishap. Davidson v. Green (D. C.) 127 F. 999; United Transp. Co. v. New York Transp. Lines, 185 F. 386, 107 C. C. A. 442; Castner v. U. S. (C. C. A.) 5 F.(2d) 214. Nor is the bankruptcy of the Navigation Company an exception to this general rule. Admiralty, it is true, may proceed on broad rules and scan the equities of the case, and afford protection to a shipper who, in good faith, pays a part of the freight, even though the freight moneys were pledged or assigned. Am. Steel Barge Co. v. Cargo of Coal, 115 F. 669, 53 C. C. A. 301. But in the case just cited the court does not go so far as to hold that an independent set-off may be sustained in admiralty, where the damages arise out of different and unconnected maritime transportations or torts. The equities favor a pledgee, who by his loans and advances enables the voyage to proceed.

[10, 11] No fault, in my opinion, is attributable to the Navigation Company for proceeding to carry out the contract of affreightment after the accident at the guard gate. It had the right to endeavor to earn the freight by carrying out the contract. The subsequent agreement with the shipper to return the boats and cargoes to Buffalo did not deprive it of the freight. The rule is that a shipper, who in the course of the transportation requires the return of his goods to the point of unloading, must pay the freight and indemnify the ship against the consequences of the bill of lading. Campbell v. Conner, 70 N. Y. 424.

Any right of recovery arising from faulty navigation, reserved in the agreement resulting in return of the cargoes, has been exercised in the libel against the tug and tow, and Spencer Kellogg & Sons, Inc., is entitled to a decree, with costs, holding both the tug Tourist and barge Rose O'Boyle equally liable for its damages sustained by reason of the disaster. As against the Tourist, libelant has its claim against the fund in the custody of the court.

The Forwarding Company, in my opinion, has valid liens against the freight of the first and second fleet, and therefore is entitled to a decree, with costs, subject, however, to the expenses paid and incurred by the shipper in bringing the cargo back to the elevator. Any suggestion as to other expenses and damages are matters for determination by the special commissioner, to be appointed to take proof of the damages and make report to this court.