THE BALTIMORE.
THE WICOMICO.
THE THOMAS TUCKER.
Nos. 16809, 16770.

District Court, E. D. New York.
Jan. 14, 1944.

Hill, Rivkins & Middleton, of New York City (George B. Warburton, of New York City, of counsel), for libellants.

Burlingham, Veeder, Clark & Hupper, of New York City (Frederic Conger, of New York City, of counsel), for respondent.

GALSTON, District Judge.

These causes by stipulation were tried together and relate to damage to the barge Thomas Tucker and the coal cargo thereon.

The Thomas Tucker was loaded with approximately 654 tons of bituminous coal, consigned for delivery alongside a steamer in New York Harbor. McKee, the bargee, said that she was in good condition, seaworthy in all respects; that he sounded the boat night and morning, finding in the pump box on each occasion only from three to four inches of water. The pump sucks dry at three inches.

On January 28, 1943, the day in question, the weather was bad, for it was snowing and sleeting heavily, with a strong northeast wind prevailing. After the loading operation was completed the Tucker was taken in tow with other barges by the tug Baltimore. There were three barges in the first tier, three in the second, and a large steel boat tailed on the stern of one of the second tier boats. The Thomas Tucker was in the second tier on the port side, immediately astern of the William McCormick. When loaded, the Thomas Tucker had a two and a half inch drag to the starboard side and quarter where the pump was located. The tow left South Amboy at about eight o'clock A. M. According to McKee, the hawsers to the head barges were from 100 to possibly 150 feet in length. The tow arrived in the vicinity of Bayonne at about two o'clock. The wind velocity was high—25 or 30 miles an hour. The Baltimore, on reaching the McAllister dock at Bayonne, put out a single line from her bow to the pier. McKee was unable to state the length of the hawser. Four or five feet separated the Thomas Tucker from the McCormick boat. The Tucker was 110 or 115 feet in length, the McCormick about 100 feet. During the afternoon of January 28th McKee shoveled snow from the deck of his boat and would periodically go to his cabin to get warm, and would again shovel the snow which lay to a depth of about six inches. During part of the time the tow of the Baltimore was heading towards New York. Then it would swing with the tide and head for Newark Bay. During the afternoon the barges were tailing toward New York with no lines out from any of the barges to the dock. McKee was of opinion that lines from the boats on the starboard side of the tow could have been put on the rack at the Pennsylvania pier which is to the east. He said at no time during the afternoon were those boats shoved close to the Pennsylvania rack. At four in the afternoon McKee sounded his tow and found about three inches of water. Later he went in and had his supper, and

while resting was awakened, at about nine o'clock, by a tug-boat whistle. At that time the barges were starting to swing to the westward, i. e. tailing toward the west. At about 12:30 o'clock he was again awakened and said:

"There was some vibration or something hitting against my boat and I didn't know whether my boat was hitting against something. * * *

"I found the port quarter of the boat was bouncing against the pier, across from where we were tied up at that time."

He sought to arouse the crew of the Wicomico, the tug which had taken the place of the Baltimore, at about four o'clock in the afternoon, but he could not awaken anyone on that boat. Water was coming in at his port corner. While continuing his effort to summon aid from the tug, he saw a Tice tug come alongside with a tow of barges, and he requested one of those in the Tice tug to go alongside the Wicomico and report his difficulty. Finally a deckhand came from the Wicomico, and as the Tucker was about to sink the lines connecting the Tucker with the William McCormick were severed. The Tucker drifted slowly out and soon sank.

The foregoing, as has been indicated, is the version of the accident as given by the Thomas Tucker's captain. Some of his testimony is corroborated by Clark, the captain of the barge Fred Munster, which was the starboard hawser boat of the Baltimore tow. He estimated the length of hawser from the Baltimore tug to the Munster at about 100 feet of line, though the length of hawser from the bow of the Wicomico to the dock was somewhat shorter than the line which the Baltimore had out. He too testified that the port side of the Tucker was hitting up against the McAllister dock.

The claimant's version of the happening of the accident cannot be reconciled with that given by the libellants. The former makes it appear physically impossible, under the conditions described, for the Thomas Tucker to have come in contact with the Gulf dock, for there were boats of a Tice tow tied up at the end of the dock against which the Tucker was banging, according to McKee.

Waelde, the master of the Wicomico, observed a Tice tug and barges in tow in the afternoon tied up at the Gulf dock. At midnight the Tice tow was still there. It did not leave until half an hour or thereabouts

after the Thomas Tucker sank. Waelde agrees with McKee that information about the sinking of the Tucker was given to him by the Tice tug as it passed the Wicomico. He tried unsuccessfully to get the tug to go back to assist. Another Tice tug, the No. 3, was tied up at the Pennsylvania stakes which blocked in the Wicomico and thus prevented the latter from going to the assistance of the sinking barge. The Thomas Tucker was 50 feet off the end of the Gulf pier. When Waelde saw that he could not give help to the Tucker he radio-telephoned his office to send a tug as soon as possible. After the sinking Waelde contended that the captain of the Tucker told him that his boat had leaked and that he could not get his pump started. Moreover McKee made no mention of the alleged banging of the Tucker against the pier.

Concerning the presence of a Tice tow at the end of the Gulf dock in such position as to make impossible contact of the Tucker with that dock Waelde is confirmed by a number of witnesses and that version must be accepted. Most important of those witnesses was the master of the Nautic, the Tice tug in question.

Davey, the master of the tug Nautic, was on watch on his tug at midnight on January 28th and said the Nautic was tied up at the end of the Gulf dock at Bayonne with a tow of four boats. The tide was the first of the flood. He saw the Pennsylvania tug ahead of him tied up at the McAllister dock with her tow. The stern of that tow was ahead of the bow of the Nautic which was lying "flush along the end of the Gulf dock". The Nautic had a bow line on the east side of the dock, i. e., the lower end of the tow was tailing westerly. When he came on watch the second tier of the Wicomico tow was 50 to 100 feet ahead of the bow of his tug, somewhat off at an angle, for as he said, the tide sets a little off the dock toward the Staten Island side, and was about 50 feet from shore from the line of the ends of the McAllister and Gulf piers. He confirmed Waelde in respect to the position of the Perth Amboy No. 3 and her tow, tying up at the Pennsylvania stakes outside of the Pennsylvania tow. At no time did Davey feel anything strike against his boat.

■■ Now it may be readily admitted that a tug is charged with the responsibility for the safety of the tow until the towage contract has been completed. The Victoria, 2 Cir., 54 F.2d 532; The Venus, D.C., 6 F.

Supp. 950, affirmed New York Trap Rock Corporation v. Cornell S. S. Co., 2 Cir., 73 F.2d 1008; The Tourist, D. C., 16 F.2d 154, affirmed, Spencer Kellogg & Sons v. The Tourist, 2 Cir., 25 F.2d 1022. But the difficulty in this case is that McKee's story about the banging of his boat against the end of the Gulf pier cannot be accepted. On balance there is the critical testimony of the disinterested witness Davey, master of the Tice tug. Whatever caused the damage to the Tucker and its consequent sinking was certainly not the result of contact between the Tucker and the Gulf pier dock, nor indeed with the Tice tug at that dock. Another view which lends support to the fact that there was no such contact is the testimony of the bargeman of the Burns Bros., which barge was adjacent to the starboard side of the Tucker. Contacts sufficiently hard to cause the Tucker to sink in all probability would have been felt by the Burns Bros. bargeman, even though he was in his cabin at the time.

Also with the flood tide and a northeast wind prevailing, the credibile testimony is that the tow was tailed off-shore toward Staten Island. Again it appears that the distance from the easterly side of the McAllister dock to the easterly side of the Gulf dock is about 500 feet. If the Wicomico's bow was about even with the easterly side of the McAllister dock, her length, which is 118 feet, together with the combined lengths of the barges William McCormick and Tucker, including four or five feet of the space between them, was 235 feet, which with the length of hawsers to the tow, make a total of about 453 feet.

There is no proved fault on the part of the Baltimore or the Wicomico to which damage could be ascribed. Of course, as soon as the master of the Wicomico was apprised of the condition of the sinking vessel he should have done everything in his power to render assistance. He tried to get the Tice tug to go back, but failed. He could not himself bring aid with his tug for, as appears, the Wicomico was blocked by the Tice tug and tow at the Pennsylvania stakes.

In the circumstances the cause of the sinking of the barge appears unexplained. It may well be that with so much snow on the deck of the Thomas Tucker the captain should have been more vigilant in his pumping operations. The libellant's burden to prove negligence has not been sustained, Stevens v. The White City, 285 U.S. 195,

52 S.Ct. 347, 76 L.Ed. 699. The libels will be dismissed. Concurrently with this opinion appropriate findings of fact and conclusions of law will be filed.