THE MARINER.
No. 947.

District Court, D. Massachusetts.
Nov. 26, 1943.

George L. Dillaway and Russell D. Greene, both of Boston, Mass., for libelants.

Thomas H. Walsh, of Boston, Mass., for claimant.

FORD, District Judge.

This is a suit in admiralty brought by Pearl A. Lewis, of Boston, and Josephine M. George, of Malden, owners of the tug "Onward", against the tug "Mariner" for damages resulting from the sinking of the "Onward" on October 14, 1941.

The facts are as follows:

The libellants purchased the "Onward", a sixty-foot tug, in the summer of 1941, for $750. At the time of purchase and for some months previous to that, she lay sunk upon riprap in the Cape Cod Canal. During the summer months, agents of the libellants had placed the "Onward" on sandbags preparatory to raising her by means of pontoons. She was finally raised and had been afloat, with the pontoons slacked off, for about five days before the Captain of the respondent "Mariner", on October 12, 1941, agreed

to tow her from the Cape Cod Canal to Butt's Yard in Quincy Bay.

After the "Onward" was raised, one Eric Hagen, a baker in the employ of the son of the libellant Lewis, caulked some of the "Onward's" seams above the water line. No caulking was done below the water line. Hagen testified he fixed one seam right underneath the rail line at the stern and another just above the rudder; that he filled these with oakum and roofing cement and nailed heavy pieces of board over them. He testified, and I find it to be a fact, that a diver had patched up "one big place" about a foot square under the water line. This patching was done with canvas and laths nailed over the latter. Other small "cuts" were filled with oakum pounded in with a piece of wood—not in the customary manner by an iron caulker. No red lead was used in the caulking at any time. This witness also testified that at no time was he able to see one whole side of the "Onward's" bottom as she lay on the sandbags of the Canal before she was raised by the pontoons, and that he had no knowledge whatsoever whether there were leaks in this side of the "Onward's" bottom. No other testimony was adduced to show the condition of this part of the "Onward". None other than this witness did any caulking prior to the date the tow began on October 14.

Canvas was placed over the hatches by the two men readying her for the trip and the canvas was lashed on the sides and laths placed around it. The windows of the deckhouse were also covered with canvas, as was the door of the deckhouse on the port side. The door of the deckhouse on the starboard side leading into the galley was kept open, as was the door leading into the engine room. There were two gasoline pumps lashed to the railing on the main deck of the "Onward", of three and two-inch dimensions, respectively. They were located just outside the door of the engine room. The hatchways, fore and aft were also covered with canvas. During the time the "Onward" was afloat in the Canal before the tow began, it was necessary each day to pump out about three feet of water at intervals of four hours.

The "Mariner" arrived at the Canal 7:30 o'clock on the morning of October 14. The weather was clear and no surf was running. At about 8 p.m., the Captain of the respondent, after "looking around" the "Onward", made fast his tow line at the forward bitts on her bow and started for Quincy. Just before the tow began the Captain of the "Mariner" had been assured by an agent of the libellants that the "Onward" " * * * was all ready to be towed to Boston" and he was also informed when he inquired whether or not she was in condition to stay afloat during the trip that there "were two new pumps aboard and they will keep her free." A reasonable inspection of the "Onward" which I find was made by the Captain of the "Mariner", would not disclose the fact that the "Onward" was in other than a seaworthy condition.

After leaving the Canal, the "Mariner" proceeded along the south shore by Duxbury and Scituate with the weather clear and the wind directly behind the tow. The deckhouse of the "Mariner" had windows on all sides and the tow could be readily seen at all times from any part of it. The trip as far as Point Allerton was without incident. After rounding Point Allerton, the wind shifted to the southwest and at this point the waves were about two or three feet in height causing spray to wash over the "Onward's" bow. Here a small squall arose and, according to the men on board the "Onward", water started to fill the engine room. It rose so rapidly that the pumps, which, according to one witness, had been in use all the way up from the Canal, were inadequate to free the water. With water coming in from below and spray covering them from above, the pumps "went dead". The water kept rising, and one of the two men on the "Onward", becoming alarmed, waived his sweater to attract the attention of the Captain of the "Mariner". This signal was seen by the "Mariner", but her Captain, although sensing something wrong, proceeded toward Peddock's Island, concluding that if the "Onward" were taking water, the safest place for it would be in the lee of the westerly side of that island. The wind at this point was blowing 16 to 18 miles an hour. On arriving off the westerly side of Peddock's Island, the "Mariner" turned about and returned to the "Onward". After attempting unsuccessfully with the aid of the two men on the "Onward", both of whom were inexperienced as sailors or machinists, to remove the pumps, Captain Jacobs urged the men to come aboard the "Mariner", which they did. At this point, the "Onward" was about half full of water. Another line was put on the "Onward's" bow and the "Mariner"

started to tow her to the mud flats off Nut Island, a point off Hough's Neck, Quincy, a distance of about 2,000 yards. No attempt was made by the Captain to beach the boat on the westerly side of Peddock's for the reason, as he testified without contradiction, that the westerly side of Peddock's was rocky and the water there was shoal water. The draft of his boat would not permit him to get in close to Peddock's; his only recourse would have been to allow the "Onward" to drift on the rocks of Peddock's Island where, without question, she would suffer serious damage. The velocity of the wind was an added difficulty in the way of providing the "Onward" a safe berth on the shore off Peddock's Island. The tow proceeded toward Nut Island before it finally sank about 200 yards off that point about 3:30 p.m.

## Conclusions

■ The libellants do not argue seriously that the "Onward" was seaworthy when it left the Cape Cod Canal in tow of the "Mariner". Such a contention would be contrary to the facts. However, there was nothing about the "Onward" to indicate this fact to the "Mariner's" Captain and the "Mariner" had a right to assume she was seaworthy.

■■ The evidence showed conclusively that the "Onward" had been inadequately caulked by inexperienced men. The foot-square patch in her bottom was likely to go at any time, as it probably did when the "Onward" ran into the squally weather after it turned Point Allerton. There is nothing else to account for the water flooding the engine room as quickly as it did. It is little wonder that the pumps stopped operating. They were in an exposed position and it should have been anticipated that spray coming over the deck would put them out of commission. No attempt was made to guard against this eventuality (cf. The Dutton No. 6, D.C., 9 F.Supp 233, 239) and the men aboard the "Onward" had no experience in the care of pumps, as far as the evidence disclosed. The caulking that was done to the "Onward" was done by inexperienced men. The conclusion is warranted that the "Onward" was unseaworthy when it left the Canal and the sinking was due to this condition. The respondent cannot be held liable under such circumstances. The Dorothy R. McCol-lum, D.C., 3 F.Supp. 894. The tug "Mariner" here was not an insurer.

However, the libellants argue that even if the "Onward" was unseaworthy, yet its unseaworthiness was not the sole cause of the sinking. They argue that the negligence of the respondent's Captain was a contributing cause and for this the "Mariner" is liable. That is true as a matter of law, if it was so as a matter of fact. Libellants contend the "Mariner" was at fault because (1) the "Mariner" failed to keep proper watch of the tow and (2) the "Mariner's" Captain had been negligent in not beaching the "Onward" off Peddock's Island. Cf. The Dutton No. 6, supra. This court cannot agree that either of these contentions has any merit.

■ It was the duty of the "Mariner" to keep the tow under observation. The Marion J, D.C., 42 F.2d 657; The Allegheny, 3 Cir., 252 F. 6. I find that Captain Jacobs made all the observations that could be reasonably expected he should make under all the circumstances. The evidence showed he was on the lookout for his tow and promptly saw the distress signal of the men aboard the "Onward". Before this, all had been well. When he saw the signal, the "Mariner" and her tow were in rather an exposed position just beyond Point Allerton. The wind, head-on, was blowing 18 miles an hour, and the Captain of the "Mariner" was justified in his judgment not to stop but to proceed as fast as possible in getting the "Onward" under the lee of Peddock's Island. I find this was a reasonable decision under all the circumstances and a course of conduct that would have been adopted under the circumstances by any reasonable mariner. If the "Mariner" had returned to the "Onward" at the exposed position she was in when the distress signal was first given, instead of continuing to tow her as rapidly as possible under the lee of Peddock's Island, it seems reasonable to conclude that the "Onward" would have sunk long before reaching Peddock's Island. Cf. The Dorothy R. McCollum, supra, 3 F.Supp. at page 896. Discontinuing the tow at the point at which he noticed the distress signal would not have saved the "Onward". The only course open under the circumstances was to get her into the lee of Peddock's Island.

■ Further, I cannot find any merit in the second contention of the libellants. I

can find no fault on the part of the "Mariner's" Captain for his failure to beach the "Onward" on Peddock's Island. The wind was blowing toward Peddock's, the shore was rocky, and there was shoal water at that point. The "Mariner" could not go in and I cannot agree that any prudent mariner would have allowed the "Onward" to drift in on the rocks. Under the circumstances, it was far better judgment to attempt to save her by beaching her on the mud of Nut Island about a mile and a half away. It was reasonable under the circumstances to attempt the latter. The efforts of the Captain of the "Mariner", at all times after he saw the distress signal, were to save the "Onward".

The conclusion of the court is that the libellants have failed to establish by a fair preponderance of the evidence that any negligence of the "Mariner's" Captain contributed to the sinking of the "Onward".

Judgment for the libellee with costs.