THE CHELSEA.

THE RUSSELL NO. 17.

THE GYLFE et al.

No. 17006.

District Court, E. D. New York.

Feb. 7, 1945.

---

Crawford & Parsons, of New York City (J. Lester Parsons, of New York City, of counsel), for libelant.

Alexander & Ash, of New York City (Edward Ash, of New York City, of counsel), for respondent Russell Bros. Towing Co., Inc.

Haight, Griffin, Deming & Gardner, of New York City (Charles S. Haight, of New York City, and Peter P. Pisapia, of Brooklyn, of counsel), for the Gylfe and Oivind Lorentzen, etc.

GALSTON, District Judge.

This cause involves a collision between the Chelsea, an ocean-going coal barge, owned by the Southern Transportation Company, the libellant, and the Gylfe, a tanker, when both vessels were anchored in the North River on May 15th, 1943. The libel was filed against the tug Russell No. 17, and the Russell Brothers Towing Co., Inc., on a claim that the damage to the Chelsea was caused by the negligence of the tug in anchoring the Chelsea too close to the Gylfe, which had been anchored first. It is also asserted that Chelsea was left by the tug at anchor after the change of tide, with no arrangements made by the Russell No. 17 to remove the Chelsea before the tide turned.

The Russell Brothers Towing Co., Inc., by petition, impleaded the Gylfe and Oivind Lorentzen as Director of Shipping and Curator of the Royal Norwegian Government. The position of the respondents is that the Russell No. 17 is a shifting tug, and that in accordance with instructions at the coal dock the Chelsea was shifted by the tug Russell No. 17 out into the river and anchored. It is contended that the captain of the barge was satisfied that he was anchored in a safe place and that the Russell went back to the coal dock and continued her general shifting operations. It is contended that if the Chelsea wanted her anchorage shifted, she should have signaled the Russell tug, and that the Chelsea failed to do that.

Thus, it is the contention of the Russell that she was free from negligence, and that the collision was due to the negligence either of the Chelsea or the Gylfe.

And the position of the Gylfe is that the collision was caused by the negligence of the Russell in placing the Chelsea in an unsafe berth, and in failing to attend the Chelsea at or before the change of tide. Also the Gylfe alleges fault in the Chelsea in that she was not properly manned, did not keep a proper lookout, and did not undertake adequate measures to prevent the collision when danger of collision was apparent.

The facts are readily determined. Dimensions are of some importance. The Chelsea is 225 feet over all, 37 feet beam, with a draft loaded of about 20 feet, and with no motive power. At about 6:45 P. M. on May 15, 1943, she had been loaded with a cargo of coal at the pier of the New York, Susquehanna & Western Railroad Company at Edgewater, New Jersey. The shifting tug, Russell No. 17, took her in tow to be moved out to the stream and placed at anchor. There was no contractual relation between the Russell Brothers Towing Company and the libellant. It had been the custom, after such loaded barges had been placed at anchor, for them to be picked up by tugs of the Card Towing Line, which did have a contract with the libellant, for towage to Red Hook Flats.

The Russell No. 17 towed the Chelsea to a point in the Hudson River slightly above the coal pier, and east of the center line of the river, about 1600 feet west of Grant's Tomb. The Chelsea dropped her anchor, having been so ordered by the tugboat captain; and the tug left after the

master of the Chelsea had informed him that it was "O K". The Chelsea let out about 40 fathoms of anchor chain over her windlass.

Meanwhile the Gylfe had been anchored, on the afternoon of May 13, 1943, also in the vicinity of Grant's Tomb. The Gylfe is a Norwegian motor tank, 408 feet over all and 56 feet beam. At the time of the collision she was loaded, awaiting convoy connection, and her draft was approximately 26 feet, 9 inches. The Chelsea was farther out in the river from the New York shore than was the Gylfe; and when the Chelsea swung to the flood tide, she was abeam of the Gylfe, which was anchored about 600 feet to the east. Obviously, with but such distance between them, in the event that the vessels swung towards each other, the relative positions of the Chelsea and the Gylfe were such that there was danger of collision. That was a likelihood that should have been considered at the time that the Chelsea was anchored.

A disinterested and convincing witness, Captain MacKenzie, a master of ferries operating between the two shores, said that he had many times observed that vessels which were anchored in the vicinity of 125th Street would swing in opposite directions on the change of tide. That possibility had not been considered by Patterson, the master of the Chelsea. He had assumed that both vessels would swing the same way, saying: "I don't understand to this minute why the other vessel swung towards New York and I swung towards New Jersey." Dethlof, the master of the Gylfe, during the evening of May 15th, went out on the lower bridge to watch the Chelsea, because in his opinion it was anchored too close to the Gylfe. According to Dethlof, the Gylfe commenced to swing to port, i. e. towards the New York shore since she was heading down stream, and the rudder was put hard to starboard to assist the swing in that direction. During the next 20 minutes she had swung about 45 degrees. Meanwhile the Chelsea, according to Dethlof, had also swung towards New York but not so far as the Gylfe. Then the Gylfe commenced to swing back towards her original position. To overcome the second swing, Dethlof gave engine orders which proved, however, ineffective in swinging the vessel towards the New York shore. Later the stern of the Gylfe swung towards New Jersey. Meanwhile, with the first of the ebb tide, the Chelsea swung towards the New Jersey shore, and the distance between the sterns of the vessels narrowed. A collision occurred at about 10:15 P. M., the stern overhang of the Gylfe striking the starboard rail of the Chelsea amidships, and scraping aft for about 45 feet, tearing the rail and causing other damage. After the vessels had swung clear they both tailed down stream to the ebb tide.

During these movements the Chelsea did not lengthen or shorten her anchorage chain.

The first question presented is whether the Russell No. 17 was at fault for leaving the Chelsea at anchorage in an unsafe position, and if so, for failing to move her before the change of tide. As has been noted, the Chelsea was anchored so close to the Gylfe that the vessels would not clear if they had swung towards each other on the change of the tide. Clearly the Chelsea could have been anchored farther out in the river and at a safe distance from the Gylfe. That the Russell Company had no towage contract with the Chelsea would not excuse damage negligently caused or contributed to by the Russell No. 17. With the situation as it was in respect to their anchorage, and a knowledge of the effect of a change in the tide on the swing of the vessels, the Russell No. 17 cannot be held without fault.

As to the Chelsea, though it may be conceded that the barge master was not a licensed man nor navigator, nevertheless it required no great knowledge of navigation to appraise the possibilities resulting from the close proximity of the two vessels, particularly in view of their respective lengths. Also, though Patterson was not a navigator, he had been going to sea for 25 years in sailing vessels and schooners and barges. Patterson knew from his experience in the Hudson at that point that there is a crosscurrent "down to the New York side, an eddy, which we generally did swing towards the New York shore, but I assumed that both vessels would swing the same way." Again he said that as to prior occasions, the swing at the time of the change of the tide from flood to ebb would depend on the way you were lying on the chain. He knew that there was not room for the vessels to clear were they to swing towards each other.

In the particular circumstances I must conclude that the careless judgment of the tug's captain regarding the anchorage was shared by the Chelsea.

■ There remains for consideration whether any contributing fault is ascribable to the Gylfe. That her master was alive to the possibility of danger from the proximity of the Chelsea must be inferred from his answer to the question as to his presence at any time on the lower bridge of the Gylfe on the evening of May 15, 1943. He said: "Yes. I used to go out there because the Chelsea had anchored too close, and I was out there watching once in a while before we actually swung, and while we started to swing I was on the bridge." Yet he did nothing after having made the observation to shift his anchorage. Moreover, it is charged too that he should have moved ahead when danger of collision was apparent, i e. during the time in which the stern of the Gylfe was swinging westward of the axis of the river. It is not at all certain that the captain of the Gylfe had sufficient time to heave his anchor "from when I knew I could not avoid the collision until the collision happened," for, said he, it would have taken eight minutes to raise his anchor without having it jammed. He took in about 360 feet of the starboard anchor chain so as to give a shortened length to swing on. That operation was started at 9:10 and was completed, he testified, in three or four minutes. When the Gylfe started to swing to starboard, the wheel was put hard to starboard to help the swing, and the stern moved towards the New York shore. The vessel swung then about 45 degrees. That was at 9:35. Dethlof said at 9:55 the ship started to fall back, so he used his engine to try to "press her the same way as she had started to swing". At 9:58, 10 o'clock and 10:02 P. M. the engine worked at minute durations. Dethlof admitted that he "didn't get her twisted as much as I wanted, but I delayed her falling back, and, in the meantime, the lighter had swung clear past us, and then when we came back, the lighter stopped swinging and fell back, and at that minute I gave 'slow ahead' on the telegraph, but as the lighter came back I had to stop on the telegraph and the engineer didn't get time to start the engine, because otherwise the propeller would have damaged the lighter." The swing back in three minutes of 45 degrees, with the change of tide prevailing in that vicinity, cannot be reconciled with the testimony given by Captain MacKenzie. It was the latter's opinion that such a swing would take from 15 to 20 minutes. I think the Gylfe's failure to go ahead with her engine, during her swing from position 1 (the Russell diagramatic exhibit) to position 3, was a contributing fault. The Tungus, 2 Cir., 5 F.2d 66.

■ Thus all three vessels were at fault, and the libellant may have a decree for half damages against the respondent and the respondent-impleaded, to be shared equally.

With this opinion appropriate findings of fact and conclusions of law will also be filed.