**ALLIED CHEMICAL & DYE CORPORATION, as owner of BARGE BARRETT NO. 1, Libellant-Appellee,**

v.

**TUG CHRISTINE MORAN, Tug Claire A. Moran, Inc., Claimant-Appellant,**

and

**Moran Towing & Transportation Co., Inc., and Seaboard Shipping Corporation, Respondents-Appellants.**

**No. 81, Docket 26910.**

United States Court of Appeals
Second Circuit.

Argued Nov. 16, 1961.

Decided May 11, 1962.

---

William A. Wilson, New York City (Warner Pyne, Albert Robin, Pyne Smith & Wilson, New York City, on the brief), for appellee.

Eugene Underwood, New York City (Robert A. Feltner, Burlingham, Underwood, Barron, Wright & White, New York City, on the brief), for appellants, Tug Christine Moran, Tug Claire A. Moran, Inc., and Moran Towing & Transportation Co., Inc.

Robert A. Feltner, New York City (Eugene Underwood, Burlingham, Underwood, Barron, Wright & White, New York City, on the brief), for appellant, Seaboard Shipping Corporation.

Before MOORE, SMITH and HAYS, Circuit Judges.

LEONARD P. MOORE, Circuit Judge.

Seaboard Shipping Corporation (Seaboard), the time charterer of the barge, Barrett #1 (Barrett), owned by Allied Chemical Corporation (Allied) engaged [1] the tug, Christine Moran (Christine), to tow the Barrett from Morehead City,

---

1. The libel alleges that respondent Moran Towing & Transportation Co., Inc. (Moran) owned the Christine and entered into the towage agreement with Seaboard. Moran denied ownership and in its answer tug Claire A. Moran, Inc. admits ownership of the Christine. In the Moran appellants' brief, ownership by tug Claire A. Moran, Inc. and operation by Moran is assumed. The decree is against Christine and Moran primarily and Seaboard secondarily.

North Carolina, to New York City. On December 4, 1954, the Christine with the barge in tow departed from Morehead City. About noon on the following day, the tug captain received a forecast of unfavorable weather. Rather than continue through a storm, he altered his course and headed into Hampton Roads, Virginia. Upon an order from the Christine, the Barrett dropped one of its two anchors at 4:40 PM in a location about three miles north of Craney Island. Two-and-a-half shackles (225 feet) of chain were paid out and until about 6:15 PM both tug and barge rode on the single anchor which did not drag. About 6:00 PM, the tug captain learned that northeast storm warnings had been hoisted and that increasing northeast winds probably reaching gale force (39–54 miles per hour) were expected late that night. After informing the Barrett's captain of the weather forecast and advising him to let out more anchor chain and drop the other anchor, if necessary, the tug captain told the Barrett's captain that the Christine would leave the barge at anchor and would dock in Norfolk overnight. At 6:15 PM, the Christine left the anchorage and proceeded to a dock in Norfolk, a run of one hour and five minutes. The Christine did not return to the anchorage until noon of the following day. By that time, the Barrett was high aground on Craney Island—so high, in fact, that a channel had to be dug to float it again.

The Barrett was a large steel-hull, well-equipped barge but without self-propelling engines, radio transmitter or mechanical signalling devices. She had a crew of four, a captain and a mate, both certified A.B. seamen, and two firemen. The crew and equipment were well above the general standard in the industry. The Barrett had two anchors, each weighing approximately 1,200 pounds.

At 8:00 PM the Barrett let out an additional one-and-a-half shackles (135 feet) of chain. Between 8:00 PM and midnight, the Barrett's log book shows that the crew believed the anchor to be holding. The chain was felt and cross-range bearings and soundings were taken in order to determine whether the barge was drifting. Sometime before midnight, the wind increased, and there was rain and snow. As the night progressed, the wind reached gale force and visibility became very poor. A log entry made sometime between midnight and 4:15 AM stated, "Heavy snow—visibility very poor—cannot see shore, other ships or any lights." The barge captain testified that he had remained on watch from midnight and that he observed the anchor chain and took soundings. However, at 4:15 AM he sighted a ship anchored 1,000 feet away; about 4:30 AM he observed trees and fences on shore; and by 4:45 AM he saw that the barge was only 150 feet off shore. At 5:00 AM the Barrett was aground on Craney Island. At no time during the period from midnight on, when the wind velocity had reached gale force, was any attempt made to drop the second anchor, increase the ballast or alert the other members of the crew. The explanation given was that during this interval the captain believed that the single anchor was holding.

Allied brought this action for damages to its barge (1) *in rem* against the Christine; (2) *in personam* against Moran as the owner and operator of the tug; and (3) against Seaboard, the time charterer. The district court found that the grounding was caused solely by the negligence of the Christine and not by any fault of the Barrett. Seaboard was held secondarily liable. Damages and costs were awarded to libellant with interest from the date of accrual of each item of damage and the matter was referred to a Commissioner to take proof thereon. The Christine, Tug Claire A. Moran, Inc., Moran and Seaboard appeal. 28 U.S. C.A. § 1292(a) (3).

The trial court premised its conclusion of liability upon the principle that the tug is the "dominant mind" of the tug-tow flotilla (Cleary Bros. v. The Dauntless, 2 Cir., 1949, 178 F.2d 72; The Rebecca, 4 Cir., 1945, 152 F.2d 607); that the tug accepted responsibility for the tow from the commencement

of the voyage, which responsibility did not terminate until the tow was safely anchored at its ultimate destination (The Anna O'Boyle, 2 Cir., 1941, 122 F.2d 286, 287; The Baltimore, 53 F.Supp. 462, 464, E.D.N.Y.1944); and that if delivery could not be made as planned, it was the tug's duty to tie the tow at some safe place and protect it until delivery could be made (The B.B. No. 21, 2 Cir., 1931, 54 F.2d 532, 534; The May McQuirl, 2 Cir., 1919, 256 F. 20). See, also, Tucker v. Reading Co., 2 Cir., 1942, 127 F.2d 527; Doherty v. Pennsylvania R.R. Co., 2 Cir., 1920, 269 F. 959, 962; The Printer, 9 Cir., 1908, 164 F. 314; The O. L. Halenbeck, 110 F. 556 (S.D. N.Y.1901); and Brown v. Cornell Steamboat Co., 110 F. 780 (S.D.N.Y.1901). Under all the facts and circumstances, the trial court concluded that, "The Christine had a continuing duty to care for and protect or render assistance to the Barrett. This duty was not terminated or suspended when the Barrett was anchored. In failing to return to aid the barge when it knew of the dangerous conditions, the Christine breached that duty." The evidence clearly supports this result.

Appellants argue that the Christine took all necessary steps for the safety of the barge including towing it into a harbor to avoid the storm, riding with it at anchor for a test period and giving instructions to be followed if the wind increased, namely, to pay out more chain and drop the second anchor. Having done these things, the Christine contends that the negligence of the Barrett in failing to follow the instructions and to take any action in the face of the emergency was the sole proximate cause of the grounding.

The Barrett was not without any responsibility to use all possible means to avoid grounding. The barge captain admitted that he "was responsible to [his] my employer for the safety of the vessel," and that, "The man on watch is responsible to see that the barge does not drag." Yet from midnight on in the face of increasing wind velocities up to gale force, no additional chain was let out and the second 1,200 pound anchor was not dropped. Despite the emergency, there is no evidence that the other three members of the crew were alerted. During a period of over four hours, the Barrett was dragging a distance of some three miles. Even when trees and shoreline were sighted at 4:30 AM, no action was taken with respect to the second anchor. A second anchor might at least have kept the Barrett in water even though shallow. With knowledge of the danger obtained by visual means, it did not contribute to the Barrett's safety merely to continue to take soundings. The negligence of the Barrett, however, does not completely expunge the Christine's fault. Both tug and barge contributed to the grounding.

Both appellants and appellee cite cases which they claim are sufficiently analogous on the facts to support their contentions. Naturally appellants find comfort in such cases exonerating the tug as The Sea King, 2 Cir., 1928, 29 F.2d 5; The Flushing, 2 Cir., 1906, 145 F. 614; and American Sugar Refining Co. v. City of New York, 2 Cir., 1929, 33 F.2d 97. Appellee with an equal determination to adhere to factual identities has produced many cases in which the tug has been held liable. Since the task of reaching a fair and equitable solution of this case is difficult enough, little benefit is gained by pointing out all the slight but important factual differences which, of necessity, must be determining factors in each specific case. Considering the duties imposed respectively on tug and barge and the facts which are virtually undisputed, each should assume responsibility for the accident. Obviously neither tug nor barge intended its conduct to be negligent and captains and crew undoubtedly acted in good faith and in accordance with their best judgments at the time. However, the accident did happen and the problem for the court is to assess the liability as fairly as possible upon the facts presented. Because of the fault of both the tug and the barge, Allied's

damages should be limited to one-half of the amount determined.

■ Seaboard appeals from that part of the interlocutory decree holding it to be secondarily liable. There is no proof that there was a demise. Nevertheless, as the time charterer, Seaboard was responsible for providing the motive power for the barge. This legal situation, however, is altered by Allied's agreement to include Seaboard as an additional insured under its policies. Therefore, Seaboard, to the extent that the hull underwriters have reimbursed Allied for the damages suffered by the barge, should be relieved from any obligation therefor to Allied. If there are other damages outside of the coverage of any relevant policies for which Seaboard as a time charterer should secondarily respond, such a determination can be made by the Commissioner in his calculation of the damages.

A motion to amend the decree with respect to interest had not been decided before the appeal was taken. The district court concluded that for this reason it was divested of jurisdiction and without power to amend the decree. Upon receiving the report of the Commissioner, the court may well wish to reconsider the interest question in the light of the facts to be presented by the parties—both as to period of time and rate.

The interlocutory decree should be modified in accordance with this opinion. No costs.

HAYS, Circuit Judge (dissenting).

I would reverse and remand for further findings.

The majority holds that the accident resulted from the negligence of both the barge and the tug. I am not satisfied that the evidence supports a finding of negligence by either.

As to the barge, the trial court specifically found that it is only "conjecture" whether putting out the second anchor or taking on more ballast would have prevented the barge's drifting (190 F.Supp. at 708). This is, in effect, a finding that the tug failed to prove that putting out the second anchor would have been effective. Accepting this finding, as I believe we must, since it has not been shown to be clearly erroneous, I cannot concur in the court's conclusion that negligence of the barge contributed to the grounding.

While I would also accept as not clearly erroneous the finding that the tug could have prevented the drift if it had gone out to protect the barge (190 F.Supp. at 707), the opinion and findings below fail to establish to my satisfaction that the tug *should* have gone out to protect the barge, i. e., that it was negligent for the tug not to do so. That is, of course, a question of law on which the findings of the lower court are freely reviewable. See Romero v. Garcia & Diaz, 286 F.2d 347, 355 (2d Cir. 1961) and cases cited.

The captain of the tug could reasonably have expected that the barge would maintain a proper watch and that the crew could detect drift. It appears that the captain and mate of the barge were aware of the usual tests for anchor drag and that they actually used one or two of them before the time when the drag began. Moreover before leaving the barge the captain of the tug instructed the barge captain that "it would be advisable that he put the other anchor over if necessary." The captain of the barge did not indicate in any way that he believed himself or his crew incapable of detecting drift, or of determining when it would be "advisable" to put out the second anchor.

In view of the instructions given by the captain of the tug, it is necessary, in order to establish that the tug should have gone out to protect the barge, to show that the tug captain did not have reasonable grounds for believing that his instructions would be followed and that the measures which he counselled would be effective.

One of the factors relevant to the latter inquiry is the safety of the anchorage. The issue of the negligence of the tug in

anchoring the barge at the spot where it was anchored was the subject of conflicting evidence. The Court made no finding on the issue, apparently because it thought that the negligence of the tug was otherwise established.

Since I do not think that negligence on the part of the tug can be inferred from the facts found, I would reverse and remand for findings on the question whether the conduct of the tug captain was unreasonable in all the circumstances.