SHAVER TRANSPORTATION COMPA-
NY, a corporation, Appellant,

v.

ALASKA FREIGHT LINES, INC., a
corporation, Appellee.

No. 17910.

United States Court of Appeals
Ninth Circuit.

March 25, 1963.

White, Sutherland & White, and Wil-
liam F. White, Portland, Or., Lynch &
Lynch, and John S. Lynch, Olympia,
Wash., for appellant.

Evans, McClaren, Lane, Powell & Moss,
and Gordon W. Moss, Seattle, Wash., for
appellee.

Before MAGRUDER, HAMLIN and
DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge.

This is the second matter that has
recently come before us involving a mis-
adventure of appellant's Tug Manzanillo.
(See United States v. Tug Manzanillo,
9 Cir., 1962, 310 F.2d 220)  It is a libel
in personam for damages to appellee's
Tug Martin, occurring when the latter
tug was swept against a pier of a bridge
across the Columbia River while the two
tugs were maneuvering a barge.  Tug
Manzanillo was found wholly responsible.
On appeal, its owner attacks the findings
as to Manzanillo's fault and Martin's lack
of fault as being clearly erroneous.

Our story begins with appellee's barge
Kevalaska, tied to the dock of the Ideal
Cement Company on the north bank of
the Columbia River, about 100 yards up-
stream from the upstream end of the
"fender" of a railroad bridge across that
river.  The bow of the barge was pointed
upstream.  Tug Martin was lashed to the
bow on the starboard side and headed
downstream.  Martin is a twin screw, ap-

parently known as a Miki Miki type, having two 600 horsepower diesel engines. The starboard engine had burnt out a bearing and was not usable. The port engine was in working order. The barge had been loaded with about 3400 tons of bulk cement in such a manner that the stern, or downstream, end of the barge was considerably deeper in the water than the bow. Thus the bow could be moved sidewise in the water more easily than the stern, the barge rotating laterally on an axis somewhere near the stern.

The railroad bridge is a turn type drawbridge and the opening on the south, or Oregon, side is about 200 feet wide. The "fender" upon which the turning part of the bridge rests is on the north side of the south opening. It runs at right angles to the bridge, and is nearly 400 feet long. The pier of the bridge on the south side of the same opening is about 37 feet wide, parallel to the "fender." The barge Kevalaska is approximately 326 feet long and 50 feet wide; Tug Martin is about 118 feet long and 28 feet wide. Thus, the combined width of the barge and tug in the position in which they were lashed together was in the neighborhood of 78 feet.

At the time of the accident, the flow of the Columbia River was about 11 feet above normal and there was a strong current, estimated by various witnesses at between 3 and 5 knots. A 5-knot current moves at about 500 feet per minute. There is at the bridge, because of a bend in the river above the Ideal Cement Company dock, a "set" in the current in the direction of the south, or Oregon, shore. The barge and Tug Martin had been in position at the dock for about two days. Martin's captain (Eide) had come up the river with the barge and a Columbia River pilot. He had been warned that the river at this point was dangerous; he knew there was a strong current, as he had been watching it off and on for the two days that he had been there. However, he had no other familiarity with the river in that location.

Because Tug Martin had one of its engines down, appellee asked appellant to send a tug or tugs to move the barge down stream through the bridge and then take it to Portland. The evidence is in conflict as to whether the request was that appellant take the barge through the bridge, or assist Tug Martin in doing so, and the court found it unnecessary to resolve this conflict. Tug Manzanillo was dispatched. She is somewhat smaller, single screw, with a 600 horsepower diesel engine. When she arrived she hove alongside Tug Martin and her captain (Speidel) had a conversation with Eide. There is considerable conflict as to what was said. It is agreed, however, that Eide inquired about taking the barge down through the north, or Washington, side of the bridge opening and was told by Speidel that this was not the way to go, but that the barge should be taken through the Oregon side. Eide said that he then told Speidel that in that case he, Speidel, should take charge, and that he hoped that Speidel knew what he was doing, because there was a strong current running and he, Eide, had been watching it. Speidel denies this, but the court found, in substance, that Eide's version was correct, and we cannot say that this finding was clearly erroneous.

It is certain that one thing that did not happen during the conversation was the reaching of any clear understanding between Speidel and Eide as to what was to be done by each tug. It was understood that Tug Manzanillo would nose in between the stern of the barge and the dock to push the barge out into the stream. It was apparently understood that Tug Martin, by reversing her one engine while the bow of the barge remained attached to the dock, would assist in swinging the stern of the barge away from the dock, and that she would also signal for the bridge to open.

Following the conversation, Tug Manzanillo moved downstream and proceeded to nose in between the stern of the barge and the dock. At about the same time, Tug Martin signalled the bridge to open and reversed her engine, thereby helping to swing the barge out from the dock. Tug Manzanillo did not put a tow line on

the barge, but merely a light holding line, the purpose of which appears to have been to keep the bow of the tug from sliding along the barge while the tug was pushing against it. When the bridge opened, Eide, who had placed part of his crew on the barge, ordered them to cast off the lines at the bow, and the whole flotilla then moved out into the stream. The barge moved across the stream at an angle, with the stern, or downstream end, somewhat closer to the Oregon shore than the bow, or upstream end. When the stern was directly opposite the southern opening of the bridge, that is, the opening on the Oregon side, the barge was still at such an angle, but almost lined up at a right angle to the bridge. At this point, Tug Manzanillo ordered the holding line cast off and, apparently by reversing her engine, slowed her movement so that the barge was drifting past her in the current of the river and the Manzanillo, with her nose against the barge, was moving along the barge toward its upstream end, or bow. By this time, the stern, or downstream end of the barge was alongside the bridge fender, and the Manzanillo was between the barge and the fender. Manzanillo threw a "tag line" to one of the crew on the barge, who proceeded to walk along the barge opposite the Manzanillo as it moved toward the bow of the barge. However, no tow line or other line was affixed by the Manzanillo to the barge at any time after the holding line was cast off.

Apparently, the set of the current caused the bow of the barge to move toward the Oregon shore more rapidly than the stern. At or shortly after the time that the Manzanillo cast off its line, Eide on the Martin saw that the barge was lined up at a right angle to the bridge and moving toward it in the current, and thereupon shut down her engine. Thus, we have the barge drifting down the river in the current, supplied with no motive power by either tug, with Tug Manzanillo moving slowly along its north side, but not attached to it, and Tug Martin on its south side, still lashed to the bow, but dead in the water. This set the stage for disaster. The set of the current pushing against the northerly side of the barge, when combined with the fact that the bow end of the barge was more lightly loaded than the stern, caused the bow to fall off toward the Oregon shore. Eide, realizing that this was happening, first put his engine ahead and his rudder hard left, in an endeavor to swing the bow back to the north. He quickly realized that this maneuver was not working, and put his engine in reverse. All of this happened within about one minute, at the end of which the Martin, being between the barge and the pier at the south side of the opening, crashed into the pier and was badly damaged.

As we have seen, the court found that the Manzanillo was solely at fault and appellant attacks certain findings in this connection. In finding X, the court found that by vetoing the course of action suggested by Eide, and choosing a different course which involved the hazardous element of the current, without informing Eide or cautioning him against it, Speidel became the dominant mind in the handling of the maneuver of the barge through the bridge, and assumed responsibility for the safe towage of the barge through the bridge. In finding XII the court found that Speidel was at fault in failing to inform Eide of the set of the current and the hazardous conditions of the pathway beneath the bridge, and that this is true whether the Manzanillo was the dominant mind of the towage operation or only a helper tug. It was found that the Manzanillo was at fault in the manner and method in which she conducted the maneuver of the barge in failing to maintain control of the barge, and in failing to prevent the swinging of the bow of the barge out of position and into the pier of the bridge. These are the only findings relating to Manzanillo's fault which are attacked. The facts as we have set them out above are substantially as they are stated in the rather detailed findings made by the court. The record fully supports the court's findings as to what happened, and we think that its finding XII as to the

fault of the Manzanillo relating to the manner and method by which she conducted the maneuver of the barge, and her failure to maintain control of the barge, are fully supported by the record and are not clearly erroneous. (Pacific Tow Boat Co. v. States Marine Corp., 9 Cir., 1960, 276 F.2d 745, 752; Admiral Towing Co. v. Woolen, 9 Cir., 1961, 290 F.2d 641, 646).

■■ Appellant also attacks the finding of the court that Tug Martin was not negligent and not at fault in stopping her engine when the barge was squarely lined up for apparent safe passage through the channel, or in any of the engine and rudder maneuvers thereafter made by the Martin when risk of collision became apparent, or in any other respect. It also found that Martin's maneuvers when risk of collision became apparent were errors in judgment *in extremis* for which Martin was not responsible. We agree with the portion of the finding last mentioned. But after careful examination of the record, we have concluded that the finding that the Martin was not at fault is clearly erroneous.

While there was a dispute as to the content of the conversation between the captains of the two tugs before the maneuvering was undertaken, certain things do stand out with complete clarity. The first and most important is that the two captains did not reach any real understanding as to how the maneuver was to be made. The only understanding had to do with its beginning, i. e., that Manzanillo would push the stern from the dock, that Martin would help to swing the barge out for this maneuver, and that Martin would signal for the bridge to open. Thereafter, each captain operated as if the other one were in charge, and each testified that he was relying on the other to manuever the barge. They were on opposite sides of the barge, and could only see each other's wheel houses. Nei-

ther could tell what the other was doing at any given moment. While Eide told Speidel that the latter was in charge, he did not get any agreement from Speidel to that effect. More important, Eide's own testimony shows that there was no understanding between the two captains as to how they would signal to each other, that he never asked Speidel for any orders, although he claimed Speidel was in charge, and that there was no decision to "float" the barge and tug through the bridge, although the fact is that that is what the maneuver turned out to be. Eide did indicate to Speidel that he could help, but he did not find out from Speidel how he was to help, and when he got into midstream, he did nothing. In fact, by shutting down his engine, he placed himself in a position where it was impossible for him to do anything, considering the speed of the current and the short distance to the bridge. He made it clear, however, in his testimony, that he knew the situation was dangerous and that he hoped that Speidel knew what he was doing, but he did not take the obvious next step, which was to find out precisely what Speidel proposed to do and what part he, Eide, was supposed to take in the maneuver. We think so complete an abdication of responsibility by Captain Eide was inexcusable. Under these circumstances, we are convinced that the Martin was also at fault, and that the court's findings to the contrary are clearly erroneous.

■ Both tugs being seriously at fault, the damages should be equally divided. (Allied Chemical & Dye Corp. v. Tug Christine Moran, 2 Cir., 1962, 303 F.2d 197; Bisso v. Waterways Transp. Co., 5 Cir., 1956, 235 F.2d 741.)

The judgment is reversed, and the matter is remanded, with direction to the trial court to modify the decree by awarding to appellee one-half of the damages suffered.