Leonard **CHITTY**, as Owner of the
**M/V TIDE LAND**

v.

The **M/V VALLEY VOYAGER**, her engines, tackle, apparel, etc., in rem and Mississippi Valley Barge Line Company, in personam.

No. 7184.

United States District Court
E. D. Louisiana,
New Orleans Division.

April 30, 1968.

Terriberry, Rault, Carroll, Yancey & Farrell, Alfred M. Farrell, Jr., New Orleans, La., for plaintiff.

Lemle & Kelleher, by George B. Matthews, N. B. Barkley, Jr., New Orleans, La., for defendant.

MITCHELL, District Judge.

This action by Leonard Chitty, owner and operator of the Motor Vessel Tide Land, was brought *in rem*, against the Motor Vessel Valley Voyager, and, *in personam*, against her owner and operator, Mississippi Valley Barge Line Company seeking to recover damages resulting from the foundering and sinking of the Tide Land which occurred on the Mississippi River at New Orleans, in the early morning of August 18, 1964. The issue of liability *vel non* was tried to the Court on a former day.

The Court, having heard the testimony of the witnesses and having considered the evidence and briefs submitted by counsel, makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

#### I

At all times material hereto the plaintiff, Leonard Chitty, was a person of the full age of majority, a resident of Houma, Louisiana and the owner and operator of the Tide Land.

#### II

The Tide Land was built in 1956 by Sewart Seacraft of Patterson, Louisiana. She is a twin screw, steel hull, diesel propelled pushboat of 446 total rated horsepower. Her approximate dimensions are 50 feet in overall deck length, 47 feet in keel length, 16½ feet in beam, and she is of 38 gross and 26 net tons.

Approximately ten weeks before the incident in question, the Tide Land was remodeled by Universal Iron Works of Houma, Louisiana without plans, on lines and specifications personally furnished by Mr. Chitty, who has never had any formal training in naval architecture or marine engineering.[1]

---

1. Transcript p. 121.

She was converted from a two to a three-deck level vessel in order to obtain better visibility over empty barges which she might push ahead. Her original pilothouse on the second deck was removed and replaced by a forward bunk room and a new pilothouse was installed as the third deck level.

## III

At all times material herein the defendant, Mississippi Valley Barge Line Company, was a corporation organized under the laws of the State of Delaware with its principal office and place of business in St. Louis, Missouri, but doing business in the State of Louisiana. It was the owner and operator of the Valley Voyager, a steel hull, diesel powered, river pushboat of approximately 5,200 horsepower, with approximate dimensions of 185 feet in length and 45 feet in beam. She is of 1,103 gross and 750 net tons. In August, 1964, the Valley Voyager was engaged in transporting large river tows to and from the Port of New Orleans with her destination and departure point being the Valley fleet located on the west (right descending) bank of the Mississippi River immediately below the Celotex Wharf Light (Mile 100.8 AHP).

## IV

On the night of August 17, 1964, the Tide Land was at her regular landing near Nine Mile Point on call for harbor work. Her two-man crew consisted of Lawrence J. Billiot, her master for four years, and Horace Scott, her deckhand/cook for four months. Captain Billiot received orders to deliver a fuel flat the following morning to the Valley Voyager, while underway. As was customary, the Tide Land was to accompany the Valley Voyager until underway fueling had been completed, then remove and return the fuel flat to the Valley fleet.

## V

At about 2:50 AM the following morning, the Tide Land got underway from the East Bank Fleet, located just above Nine Mile Point on the New Orleans side of the river, enroute to the Valley fleet. At approximately the same time, the Valley Voyager was getting underway upriver, pushing her northbound tow of 24 barges. Due to a change in orders, the Tug Norma G had previously delivered the fuel flat and had tied her off to the starboard side of the Valley Voyager.

## VI

During the Tide Land's downriver trip, Captain Billiot contacted the Valley Voyager by radio and engaged in a conversation with Captain John C. Crader, a licensed Mississippi River towboat pilot for 20 years, who was on watch and at the controls of the Valley Voyager.

Initially, Captain Billiot's testimony inferred that during this radio conversation he was ordered by Captain Crader to tie off the Tide Land to the port side of the Valley Voyager.

Captain Billiot's later admission that he was not "ordered" by Captain Crader to tie up on the port side of the Valley Voyager[2] is substantiated by Captain Crader[3] and Horace Scott.[4] Captain Billiot later conceded that the decision as to whether or not to tie up alongside the Valley Voyager or to follow her upriver was entirely his to make.[5]

## VII

During or shortly after the conversation with Captain Crader, Captain Billiot sighted the Valley Voyager and her tow rounding Six Mile Point. Captain Billiot continued downstream, rounded up astern of the Valley Voyager and then proceeded to tie off to her port side. Under Captain Billiot's directions, the mooring was attended to by Mr. Scott, utilizing a new single six inch manila line on both the bow and the stern.[6] The vessels

2. Transcript, pp. 62, 63.

3. Transcript, p. 188.

4. Deposition of H. Scott, p. 28.

5. Transcript, p. 62.

6. Transcript, p. 28; Deposition of Horace Scott, pp. 29, 43.

were flush alongside and the main deck levels of each were about the same height. The make up of the Tide Land to the Valley Voyager was observed by Captain Crader. The Tide Land's location was about midship of the Valley Voyager, with her bow some 20 feet abaft the raised pilothouse of the Valley Voyager, with the latter's stern overlapping that of the Tide Land by some 40 feet. The Valley Voyager's pilot had the right to direct the Tide Land not to tie up at all but to follow her upriver. However, Captain Crader approved the tieing off, the location of the Tide Land, her alignment of lines and said all were proper and customary.[7] The Tide Land's rudder was held amidship and very little propeller power was used thereafter but the captain kept her engine slow ahead to prevent clutch damage.[8] Captain Crader assumed that the Tide Land would not use her own propulsion inasmuch as the Valley Voyager would furnish all propulsion and steering, as was customary, and conceded that he was in overall command of the flotilla in respect to navigation.[9]

## VIII

The river was low and the navigation of the flotilla was not encumbered by unusual wind or current conditions.

With the Tide Land alongside, the Valley Voyager proceeded upriver with her tow, rounded Nine Mile Point (Carrollton Bend—a sharp bend to the left for upbound traffic); increased the speed of her engines to full ahead; and proceeded up the straight reach of the river toward Twelve Mile Point. After passing under the Huey P. Long Bridge and due to the presence of three sand dredges located on the left descending bank, Captain Crader reduced the speed of the Valley Voyager's engines. After passing the dredges, Captain Crader again increased engine speed to full ahead and continued upriver toward Twelve Mile Point. Shortly thereafter a southbound tow was sighted by Cap-

tain Crader coming around Twelve Mile Point and reduced his engine speed to allow the southbound tow to clear the point. At that time, the Valley Voyager and her tow were approximately in mid-river, slightly favoring the right descending bank. As the southbound tow rounded Twelve Mile Point, signals were exchanged and a starboard-to-starboard passing was effected without incident. Thereafter, Captain Crader placed his engines full ahead.

## IX

When the Valley Voyager's tow was abreast of Standard Oil Dock Light (Mile 108.7 AHP), Captain Crader began steering the tow around Twelve Mile Point.

The evidence is clear from the testimony of Captain Horton, the Valley Voyager's master, Captain Crader and Captain Billiot that a towboat such as the Valley Voyager does not steer her tow around a bend such as one would steer an automobile around a turn. Every push tow has an invisible "pivot point" which generally depends for its location on the size and makeup of the tow. Accordingly, in making a turn, a tow swings on its "pivot point". Consequently, when a tow such as that being handled by the Valley Voyager is maneuvered around a bend to the right, the head of the tow swings laterally to starboard and the stern, including the towboat, swings laterally to port. Captain Billiot admitted that he was familiar with this phenomenon and was fully aware that, when the Valley Voyager began steering around Twelve Mile Point, the port side of the Tide Land would be exposed to and pushed laterally through the water.[10]

## X

As the port side of the Valley Voyager pushed flush against the starboard side of the much smaller Tide Land amidship, the harbor tug was breasted (driven sideways) through the water throughout

---

7. Transcript, pp. 206, 207.

8. Transcript, pp. 33, 34.

9. Transcript, pp. 213, 214.

10. Transcript, p. 79.

her length, causing her to list to port and scoop water over her small freeboard and eight inch bulwark. The water rushed through the open engine room and galley doors and instantly found its way through the engine grating into the void hull. As the Tide Land was sinking, her master sounded two short rapid blasts on his whistle and flashed his searchlight.[11] The Valley Voyager's pilot, stationed inside her wheelhouse, was alerted and, at approximately the same time, heard his mate calling out from below. He went to the port wing of the wheelhouse and saw the Tide Land keeling over to port, with both her bow and stern lines still made fast to cavils on the deck of the Valley Voyager. The Tide Land's deckhand jumped to the deck of the Valley Voyager. Captain Crader observed Captain Billiot come out of the Tide Land's pilothouse and climb up on the rail of the Tide Land. However, before Captain Billiot could board the Valley Voyager, the Tide Land rolled over and, as she began to sink, the force of the water caused her lines to sever, and Captain Billiot had to jump into the river and swim to shore. As the Tide Land broke free of her lines, she sank in 120 feet of water off Twelve Mile Point (Mile 109 AHP).[12]

### XI

Plaintiff contends that the cause of the sinking of the Tide Land was due to the Valley Voyager's immoderate rate of speed while approaching and negotiating 12 Mile Point. There is conflicting testimony as to the actual speed of the Valley Voyager. Captain Crader testified that, at best, she made no more than eight or nine miles per hour at full speed. But the Valley Voyager's logs and reports, prepared shortly after the accident, state that the flotilla got underway at 2:50 AM from the Valley fleet at Mile 100 and the accident happened at 3:50 AM at Mile 109, thus showing an average of 9 miles per hour. However, it is undisputed that when getting underway the Valley Voyager and her 24 barges proceeded from the fleet up to and around Six Mile Point at idling speed prior to increasing to full speed in the straight reach. In the succeeding run there were several other reductions in speed. Accordingly, it would seem that the flotilla must have exceeded her reported average speed of 9 miles in the hour's run, and her pilot's estimate of 8 or 9 miles when on full speed during the five minutes preceding the casualty is proven too conservative.

Captain Billiot and Mr. Scott estimated the speed of the Valley Voyager at approximately 12 MPH. The Court finds as a fact that, while negotiating 12 Mile Point, her speed was immoderate in view of all the facts and circumstances existing at that time.

### XII

The Court finds that Captain Crader was negligent in failing to keep his tow under proper observation. Had a proper lookout been kept, those on board the Valley Voyager would have observed the difficulties encountered by the Tide Land as the Valley Voyager was negotiating Twelve Mile Point and, with timely action, the catastrophe possibly could have been averted.

Captain Crader had the right to refuse to allow the Tide Land to tie up to the Valley Voyager but, since he permitted her to do so, he assumed control of the navigation of the entire flotilla and had the duty to exercise the same skill and care toward the Tide Land that he had toward the rest of the flotilla.

### XIII

The defendant contends that the cause of the sinking was the unseaworthiness of the Tide Land in that she was unable to correct her port list because of alleged instability as a result of the conversion made by Mr. Chitty. Mr. Chitty admitted that the Tide Land was converted under his personal direction and to his personal specifications, without the benefit of professionally prepared plans; that no stability tests were performed on

---

11. Transcript, pp. 48–50.

12. Transcript, p. 52.

the vessel; and that no mathematical calculations were made with regard to the effect the additional weight and height would have on her. Captain John W. Bachrach, a marine stability expert, testified that when a vessel such as the Tide Land is converted from two to three deck levels, the added height and weight decreases her stability and curtails her ability to right herself after a list.[13] These factors certainly raise in the Court's mind the possibility that the conversion of the Tide Land affected her stability to such an extent as to render her unseaworthy. However, since no stability tests were conducted after her conversion and Captain Bachrach made no inspection of her, on the basis and weight of the evidence presented, this Court feels that it would not be proper for it to find as a fact that the Tide Land was unseaworthy.

### XIV

Captain Billiot should have foreseen the dangerous situation that prevailed when the Tide Land first began to list and take on water. He admitted that he was concerned about the speed of the Valley Voyager in the straight reach from Nine Mile Point to Twelve Mile Point [14] and that, when she began steering around Twelve Mile Point, he knew that the port side of the Tide Land would be breasted (pushed laterally) through the water.[15] Notwithstanding, he made no effort to protect his vessel from the inrush of water [16] or communicate with Captain Crader by radio or whistle signal and request him to slow down or allow the Tide Land to drop off before reaching Twelve Mile Point.[17]

When the Tide Land first began to list, Captain Billiot should have attempt-ed to take proper helm action in order to try to correct his list and to avert the catastrophe.[18] The Court finds Captain Billiot negligent in failing to do so.

Accordingly, the Court finds that although he had ample opportunity to do so, Captain Billiot negligently failed to warn the Valley Voyager of the Tide Land's peril until it was too late to avert the casualty.

### CONCLUSIONS OF LAW

#### I

The Court has jurisdiction of this action in admiralty and venue is properly laid in the Eastern District of Louisiana, New Orleans Division.[19]

#### II

In every contract of towage there is implied an engagement that each party, i. e., the tow and the tower, will perform his duty and that neither will unnecessarily imperil the other or increase any risk incidental to the service undertaken.[20]

#### III

The Valley Voyager as the towing vessel is not liable as an insurer or a common carrier. However, she and her operators owed a duty to her tow to exercise that degree of caution, reasonable care and maritime skill which prudent navigators usually employ in similar undertakings and with such consideration as special circumstances may require.[21]

#### IV

The duties owed the Tide Land by the Valley Voyager were not lessened by the fact that no towage contract was

13. Transcript, pp. 224 et seq.

14. Transcript, p. 91.

15. Transcript, pp. 78–79.

16. Transcript, p. 82.

17. Transcript, pp. 91–92.

18. Transcript, pp. 86, 87.

19. 28 USC 1333.

20. 86 C.J.S. Towage § 12, p. 996.

21. Gulf Wave Towing Co. v. Mitchell, 176 F.Supp. 636 (ED La.–1959) ; Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932); South, Inc. v. Moran Towing & Transportation Co., Inc., et al., 252 F.Supp. 500 SD NY–1965), aff'd, 360 F.2d 1002 (CA 2–1966); United States Fire Insurance Co. v. Gulf States Marine & Mining Co., 262 F.2d 565 (CA 5–1959).

involved, for one towing without charge is under a duty to use due care in the performance of such undertaking and is liable for any damage resulting from failure to do so.[22]

## V

■ When a tug is in charge of a flotilla, her obligation to use due care includes, among others, the duty to keep her tow under observation,[23] to maintain proper speed in order to keep her tow under control,[24] and to care for the safety of her tow in general.[25]

■ Those in charge of the Valley Voyager were in overall command of the flotilla and were responsible for the navigation of not only the Valley Voyager but the Tide Land as well and they were responsible for all navigational decisions including the choice of speed and how the bends were to be run.[26]

■ It was for the Valley Voyager to regulate the speed of the vessel in accordance with the exigencies of the voyage and it was her duty to employ such rate of speed only as is reasonably safe to her tow.[27]

## VI

■ The pivoting of the Valley Voyager to starboard with its stern swinging to port and at full speed was a cause of the foundering of the Tide Land. The Valley Voyager had run the first bend at Six Mile Point at reduced speed. The Court concludes that it was fault to have increased to full ahead in these circumstances when preparing to swing the tow around Twelve Mile Point.

■ When a vessel such as the Valley Voyager has another under her control and her speed and maneuver causes the other to take water and founder, as here, the towing vessel is liable.[28]

## VII

■ The Valley Voyager owed a duty to the Tide Land to keep her under observation.[29] When the Tide Land first began to list and take on water, had the tower properly observed her tow, she could have taken proper steps to avert the catastrophe. The Court concludes that failure to keep her tow under observation was fault on the part of the Valley Voyager contributing to the accident herein.

## VIII

■ Where a flotilla of vessels is being towed by a tug and the tug and tow are under separate crews, the tug has control over the tow only to the extent of carrying out the towage contract. The master and crew of the tow retain control over the tow in all other respects and determine what acts are to be done for the safety and direction of the tow

22. King v. Red Star Towing & Transportation Co., 48 F.2d 633 (ED NY–1931); The Chelsea, 58 F.Supp. 969 (ED NY–1945).

23. The Mariner, 52 F.Supp. 739 (DC Mass.–1943).

24. Great Lakes Towing Co. v. American Shipbuilding Co., 243 F. 849 (CA 6–1917).

25. 86 C.J.S. Towage § 34, p. 1006 et seq.

26. The Connecticut, 103 U.S. 710, 26 L.Ed. 467 (1881); The Adelaide, 140 F.2d 552, 1944 AMC 181 (CA 2–1944); Bisso et al. v. Waterways Transportation Co., 235 F.2d 741, 1956 AMC 1760 (CA 5–1956); Otto Candies, Inc. v. Great American Ins. Co., 221 F.Supp. 1014 (ED La.–1963).

27. The INCA, 148 F. 363 (CA 5–1906).

28. N. Y. Trap Rock Corp. v. Tug Devon, 371 F.2d 430, 1967 AMC 320 (CA 2–1967); Port Republic, 1953 AMC 1898 (ED NY–1953).

29. The Mariner, supra; The Coleraine, 179 F. 977 (DC NY–1910) aff'd, 185 F. 1006 (CA 2–1911).

in cases of emergency.[30] It is generally the duty of the tow to follow the guidance of the tug. However, the Captain of a tow in danger is under a duty to warn the tug thereof [31] and to use all possible means to avoid injury to the tow.[32]

## IX

■ Captain Billiot knew that when the Valley Voyager negotiated Twelve Mile Point the port side of the Tide Land would be broached (pushed laterally) through the water, yet he allowed her galley doors to remain open. When the Tide Land began to list and take on water, Captain Billiot did nothing to protect her from the inrush of water. He made no attempt whatsoever, either by whistle signal or radio, to warn the Valley Voyager of the Tide Land's distress until it was too late, nor did he take any helm action in an attempt to avert the catastrophe.

The Court concludes that a concurring cause of the sinking of the Tide Land was the failure of Captain Billiot to attempt to avert the casualty.

## X

■ The negligence of the Valley Voyager might have been overcome by proper care on the part of the Tide Land and, conversely, the negligence of the Tide Land might have been overcome by proper care on the part of the Valley Voyager. The Court concludes that the negligent acts attributable to both vessels contributed to, and had a causal connection with, the sinking of the Tide Land. Where both tug and tow are guilty of fault or negligence concurring to cause the catastrophe, damages will be divided.[33]

Let judgment be entered accordingly.

30. Department of Highways v. Whiteman Bros., Inc., 29 So.2d 399 (La.App. 1–1947).

31. The Coleraine, supra.

32. South, Inc. v. Moran Towing & Transportation Co., 252 F.Supp. 500 (SD NY–1965).

33. The Vale Royal, 51 F.Supp. 412 (DC D.Md.–1943); Allied Chemical & Dye Corp. v. Tug Christine Moran, 303 F.2d 197 (CA 2–1962).